DAVIS, Judge.
 

 *68
 
 This appeal involves a variety of issues stemming from the trial court's order adjudicating a juvenile to be abused, neglected, and dependent. Among the issues presented is whether a parent who was compelled to testify in a juvenile adjudication hearing was deprived of her Fifth Amendment right against self-incrimination when-despite her clear invocation of that right-the trial court ordered her to answer a question likely to elicit an incriminating response. A.S. ("Respondent") appeals from an order (1) adjudicating her daughter L.C. ("Lily")
 
 [1]
 
 to be an abused, neglected, and dependent juvenile; (2) ceasing reunification efforts; and (3) setting adoption as the juvenile's permanent plan along with a concurrent plan of guardianship.
 

 *85
 
 After careful review, we affirm in part, vacate in part, and remand.
 

 *69
 

 Factual and Procedural Background
 

 On 4 February 2016, the Guilford County Department of Social Services ("DSS") received a report alleging that Lily had been physically abused. Lily, who was less than eight months old at the time, had been admitted to Brenner Children's Hospital in Winston-Salem, North Carolina with various injuries, including three fractured ribs, a bruise consistent with a bite mark on her left shoulder, and bruises on both feet. Lily's femur was also injured, although the pediatrician could not conclusively state whether it was fractured.
 

 At the time these injuries occurred, Respondent was living in an apartment with her adult sister ("Ida"), her friend ("Becky"), the minor children of Ida and Becky, and Respondent's boyfriend ("Matt"). After DSS became involved, Respondent, Ida, and Becky submitted to polygraph testing at the request of DSS regarding the cause of Lily's injuries, but Matt failed to do so. As a result, Respondent entered into a safety plan with DSS that barred Matt from having any future contact with Lily.
 

 On 9 April 2016, DSS received another report that Lily had been physically abused based on her admission to Brenner Children's Hospital with new injuries, including a right fractured clavicle, hemorrhaging in her brain, bruising on various parts of her body, a swollen right eye, and a left rib fracture. Respondent admitted to a law enforcement officer that she had violated her safety plan by allowing Matt to care for Lily while she was at work on the evening of 7 April 2016. Respondent testified that when she came home from work at approximately 10:30 p.m., she noticed that Lily "was not acting like herself," "had bruises on her," and had one eye "rolled in the back of her head[.]" Respondent accused Matt of having harmed Lily and did not believe him when he denied responsibility for her injuries.
 

 That night, Respondent gave Pedialyte to Lily but did not immediately seek medical attention for her because Respondent was afraid that DSS would "take [Lily] from me because [Matt] was not supposed to be there...." Two days later-after having observed Lily alternate between acting normally and "[j]ust go[ing] into a daze"-Respondent took Lily to Thomasville Hospital. On 10 April 2016, Respondent was charged with misdemeanor child abuse, and Matt was charged with two counts of felony assault on a child inflicting serious injury.
 

 On 11 April 2016, DSS filed a petition alleging that Lily was an abused, neglected, and dependent juvenile and obtained non-secure custody of her. At the time the petition was filed, both Respondent and Matt were confined in the Guilford County Jail on the above-referenced charges.
 

 *70
 
 On 12 May 2016, an adjudicatory and dispositional hearing was held before the Honorable Betty J. Brown in Guilford County District Court. DSS called Respondent as its sole witness during the adjudicatory portion of the hearing. In an order entered on 5 July 2016, the trial court adjudicated Lily to be an abused, neglected, and dependent juvenile. In the dispositional portion of the order, the trial court ceased reunification efforts and ordered that the permanent plan for Lily be changed to adoption with a concurrent plan of guardianship. Respondent filed a timely notice of appeal.
 

 Analysis
 

 I. Adjudication
 

 Respondent argues that the trial court erred in adjudicating Lily to be an abused, neglected, and dependent juvenile. We review the trial court's order of adjudication to determine "(1) whether the findings of fact are supported by clear and convincing evidence, and (2) whether the legal conclusions are supported by the findings of fact."
 
 In re Q.A
 
 ., --- N.C.App. ----, ----,
 
 781 S.E.2d 862
 
 , 864 (2016) (citation, quotation marks, and brackets omitted). Findings of fact that are supported by competent evidence or are unchallenged by the appellant are binding on appeal.
 
 In re A.B
 
 ., --- N.C.App. ----, ----,
 
 781 S.E.2d 685
 
 , 689,
 
 disc. review denied
 
 ,
 
 369 N.C. 182
 
 ,
 
 793 S.E.2d 695
 
 (2016). "Such findings are ... conclusive on appeal even though the evidence might support a finding to the contrary."
 

 *86
 

 In re McCabe
 
 ,
 
 157 N.C.App. 673
 
 , 679,
 
 580 S.E.2d 69
 
 , 73 (2003). We review a trial court's conclusions of law
 
 de novo
 
 .
 
 In re J.S.L
 
 .,
 
 177 N.C.App. 151
 
 , 154,
 
 628 S.E.2d 387
 
 , 389 (2006).
 

 As an initial matter, Respondent argues that Finding No. 22 and its subparts in the trial court's 5 July 2016 order merely contain recitations of her testimony and, therefore, do not constitute actual findings of fact by the trial court. Finding No. 22 states, in relevant part, that at the 12 May 2016 hearing Respondent "proffered, in pertinent part, the following testimony" and then summarizes Respondent's testimony in 99 subparts. We agree with Respondent on this issue.
 
 See
 

 In re Bullock
 
 ,
 
 229 N.C.App. 373
 
 , 378,
 
 748 S.E.2d 27
 
 , 30 ("Recitations of the testimony of each witness do not constitute findings of fact by the trial judge." (emphasis omitted)),
 
 disc. review denied
 
 ,
 
 367 N.C. 277
 
 ,
 
 752 S.E.2d 149
 
 (2013). Accordingly, we do not treat those recitations of testimony as actual "findings" in conducting our analysis.
 

 Respondent also challenges Findings Nos. 12-21, 25-29, and 33 on the ground that they are verbatim recitations of allegations contained in the petition and, as such, should be disregarded. As a general matter,
 
 *71
 
 "the trial court's findings must consist of more than a recitation of the allegations" contained in the juvenile petition.
 
 In re O.W.
 
 ,
 
 164 N.C.App. 699
 
 , 702,
 
 596 S.E.2d 851
 
 , 853 (2004) (citation omitted). However,
 

 it is not
 
 per se
 
 reversible error for a trial court's fact findings to mirror the wording of a petition or other pleading prepared by a party. Instead, this Court will examine whether the record of the proceedings demonstrates that the trial court, through processes of logical reasoning, based on the evidentiary facts before it, found the ultimate facts necessary to dispose of the case. If we are confident the trial court did so, it is irrelevant whether those findings are taken verbatim from an earlier pleading.
 

 In re J.W.
 
 ,
 
 241 N.C.App. 44
 
 , 48-49,
 
 772 S.E.2d 249
 
 , 253,
 
 disc. review denied
 
 ,
 
 368 N.C. 290
 
 ,
 
 776 S.E.2d 202
 
 (2015). Accordingly, we will only consider those findings that are, in fact, supported by evidence in the record regardless of whether they mirror the language used in the petition.
 
 [2]
 

 The following findings of fact are supported by Respondent's own testimony: (1) in February 2016, Lily was admitted to Brenner Children's Hospital after having sustained numerous injuries, including three fractured ribs, multiple bruises, a bite mark on her shoulder, and a possible fractured femur (Finding No. 12); (2) at the time that these injuries occurred, Lily was living with Respondent and three other adults, including Matt (Finding No. 13); (3) at DSS's request, all of these adults except for Matt took a polygraph test regarding the cause of Lily's injuries (Finding No. 14); (4) in March 2016, Respondent and DSS entered into a safety plan that forbade Matt from having any future contact with Lily (Finding No. 15); (5) on 7 April 2016, Respondent left Lily in Matt's care (Finding No. 17); (6) when Lily was taken to the hospital on 9 April 2016, medical professionals discovered that she had suffered multiple injuries including a fractured collarbone, a brain hemorrhage, and bruising on various parts of her body, including her face (Finding No. 16); and (7) Respondent had noticed injuries to Lily at least two days prior to taking Lily to the hospital but had delayed seeking medical care because she feared DSS would take custody of the child based on her violation of her safety plan in allowing Matt to have contact with Lily (Finding Nos. 19, 24(d)).
 

 *72
 
 We must next determine whether the trial court's adjudication of Lily as an abused, neglected, and dependent juvenile was supported by adequate findings that were based upon competent evidence in the record.
 

 A. Abuse
 

 An abused juvenile is defined, in pertinent part, as
 

 *87
 
 [a]ny juvenile less than 18 years of age whose parent, guardian, custodian, or caretaker:
 

 a. Inflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means; [or]
 

 b. Creates or allows to be created a substantial risk of serious physical injury to the juvenile by other than accidental means[.]
 

 N.C. Gen. Stat. § 7B-101(1)(a)-(b) (2015).
 

 Although the trial court's order does not specify which particular findings provided the basis for its determination that Lily was an abused juvenile, it appears that this determination was primarily based upon Finding No. 24(b), wherein the trial court found that Respondent "did in fact know that [Matt] caused the first round of injuries that her child suffered in February 2016." Such knowledge would support a determination that Respondent "allow[ed] to be created a substantial risk of serious physical injury to the juvenile by other than accidental means[.]" N.C. Gen. Stat. § 7B-101(1)(b).
 

 However, Respondent argues that Finding No. 24(b) was impermissibly based upon testimony by her that was elicited in violation of her right against self-incrimination under the Fifth Amendment to the United States Constitution. The standard of review for alleged violations of constitutional rights is
 
 de novo
 
 .
 
 State v. Graham
 
 ,
 
 200 N.C.App. 204
 
 , 214,
 
 683 S.E.2d 437
 
 , 444 (2009),
 
 appeal dismissed
 
 ,
 
 363 N.C. 857
 
 ,
 
 694 S.E.2d 766
 
 (2010).
 

 The Fifth Amendment-which is applicable to the states through the Fourteenth Amendment-"privileges an individual not to answer official questions put to him in any ... proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."
 
 Debnam v. N.C. Dep't of Correction
 
 ,
 
 334 N.C. 380
 
 , 384-85,
 
 432 S.E.2d 324
 
 , 328 (1993) (citation, quotation marks, and emphasis omitted). Our Supreme Court has held that "[t]he
 
 *73
 
 claim of privilege should be liberally construed."
 
 Herndon v. Herndon
 
 ,
 
 368 N.C. 826
 
 , 830,
 
 785 S.E.2d 922
 
 , 925 (2016) (citation and quotation marks omitted).
 

 It is well established that "[t]his Fifth Amendment protection extends to civil proceedings."
 
 Id.
 
 at 829,
 
 785 S.E.2d at 925
 
 (citation omitted). When the privilege is invoked in a civil case, "the finder of fact in a civil cause may use a witness' invocation of his fifth amendment privilege against self-incrimination to infer that his truthful testimony would have been unfavorable to him."
 
 In re Estate of Trogdon
 
 ,
 
 330 N.C. 143
 
 , 152,
 
 409 S.E.2d 897
 
 , 902 (1991) (citation omitted).
 

 In the present case, Respondent received a summons ordering her to appear at the 12 May 2016 hearing. At the adjudicatory phase of the hearing, DSS's attorney called Respondent as its sole witness. At the beginning of her examination, the following exchange occurred between Respondent and DSS's counsel.
 

 Q. Has any one [sic] informed you that you have a right to plead the Fifth Amendment in regards to questions that may incriminate you, specifically, including incriminating you as to the charges that you're currently facing?
 

 A. Yes, sir.
 

 Q. And they also explained to you that should you decide to plead The Fifth, in this particular case, that The Court, under the case law, can take civil inference and infer that had you testified, and answered the questions asked, that your testimony would have been harmful to your case?
 

 A. Yes, sir.
 

 Q. And it's my understanding that you wish to proceed with this hearing?
 

 A. Yes, sir.
 

 Respondent then began answering questions posed by DSS's attorney regarding the events that caused DSS to first become involved with Respondent's family in February 2016, including questions regarding Lily's initial injuries and hospitalization. However, as shown in the following exchange, after answering several questions regarding Matt's status under the safety plan entered as a result of Lily's February 2016 injuries, Respondent attempted to invoke her right against self-incrimination when she was explicitly
 
 *88
 
 asked who she thought was responsible for those injuries.
 

 *74
 
 Q. And the first Safety Plan, back in February, was there anything that prevented [Becky or Ida] from being around the child?
 

 A. They just couldn't be around her by theirself [sic]....
 

 Q. You couldn't either at first?
 

 A. No, sir.
 

 Q. Right, but [Matt] couldn't be around [Lily] at all?
 

 A. Yes, sir.
 

 Q. Why do you reckon the Department and you, entered into an agreement, that for some reason treated one out of those four people completely different?
 

 ....
 

 Q. Do you know why [Matt] was treated differently than the other three people in that Safety Plan?
 

 A. Because he didn't take his lie detector test.
 

 THE COURT: Because what?
 

 A. He did not take his lie detector test.
 

 Q. And everybody else did?
 

 A. Yes, sir.
 

 Q. So after you found that out, of the four people-
 

 A. Yes, sir, and that's the first Safety Plan [sic] it's not the only Safety Plan.
 

 Q. -of those four people; you, [Becky, Ida, and Matt], those are the only four people that could have done it; right?
 

 A. Yes, sir.
 

 Q. Who did you think did it?
 

 A. After everything that's done happened-
 

 Q. Uh-Uh.
 
 At that time, before the child got the next round of injuries, after [Matt] refused to cooperate with police, who did you think hurt your child; breaking three ribs, a leg, bite marks, and bruises to the feet
 
 ?
 

 *75
 
 A.
 
 I plead the Fifth
 
 .
 

 (Emphasis added.)
 

 DSS's attorney argued that Respondent had waived her Fifth Amendment privilege by "open[ing] the door to this line of testimony through her prior testimony...." After hearing arguments from both sides, the trial court ruled that Respondent had "waived her Fifth Amendment rights, and is required to answer the questions." Respondent proceeded to testify as to her belief that Matt had most likely been responsible for Lily's February 2016 injuries. In its subsequent order, the trial court found that Respondent "did in fact know that [Matt] caused the first round of injuries that her child suffered in February 2016."
 

 Respondent contends on appeal that the trial court erred by ordering her to respond to the questions of the DSS attorney after she clearly invoked her right against self-incrimination. DSS, conversely, argues that her Fifth Amendment rights were not violated because during the initial portion of her testimony Respondent had voluntarily answered questions regarding some of the circumstances surrounding Lily's February 2016 injuries, thereby waiving her right to refuse to answer further questions on that topic.
 

 Our Supreme Court has recently emphasized the importance of distinguishing between
 
 compelled
 
 witnesses and
 
 voluntary
 
 witnesses when analyzing whether a witness's Fifth Amendment rights have been violated:
 

 Depending on whether a witness is compelled to testify or testifies voluntarily, the right against self-incrimination operates differently....
 
 A compelled witness has no occasion to invoke the privilege against self-incrimination until testimony sought to be elicited will in fact tend to incriminate
 
 .... By contrast, a
 
 voluntary
 
 witness has the benefit of choosing whether to testify and determines the area of disclosure and therefore of inquiry. For that reason, a voluntary witness cannot claim an immunity from cross-examination on the matters he has himself put in dispute.
 

 Herndon
 
 , 368 N.C. at 830,
 
 785 S.E.2d at 925
 
 (internal citations and quotation marks omitted and emphasis added).
 

 This distinction between compelled and voluntary witnesses was explained in
 
 *89
 

 Brown v. United States
 
 ,
 
 356 U.S. 148
 
 ,
 
 78 S.Ct. 622
 
 ,
 
 2 L.Ed.2d 589
 
 (1958), a case that was relied upon by our Supreme Court in
 
 Herndon
 
 . As the
 
 *76
 
 United States Supreme Court observed in
 
 Brown
 
 , a voluntary witness is treated differently from a compelled witness because the voluntary witness "has the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness,
 
 not to testify at all
 
 ."
 

 Id.
 

 at 155
 
 ,
 
 78 S.Ct. at 627
 
 ,
 
 2 L.Ed.2d at 597
 
 (emphasis added).
 

 Accordingly, when a witness testifies
 
 voluntarily
 
 , the Fifth Amendment privilege will not provide a shield against questions as to matters that the witness has herself put into contention. When a witness is
 
 compelled
 
 to testify, however, her right to assert the privilege is preserved until such time as an answer to a particular question would incriminate her. At that point, the witness must decide whether to invoke the privilege or waive it.
 
 See
 

 Herndon
 
 , 368 N.C. at 830,
 
 785 S.E.2d at 925
 
 . Once "the individual invokes the fifth amendment privilege, the trial court [then] must determine whether the question is such that it may reasonably be inferred that the answer may be self-incriminating. In situations where the trial court determines that the answer will not be self-incriminating, the trial court may compel the individual to answer the question."
 
 State v. Eason
 
 ,
 
 328 N.C. 409
 
 , 418-19,
 
 402 S.E.2d 809
 
 , 813 (1991) (internal citations omitted).
 

 Here, Respondent was a compelled witness rather than a voluntary witness because she was called by DSS and did not have a choice regarding whether or not to testify. As explained in
 
 In re Davis
 
 ,
 
 116 N.C.App. 409
 
 ,
 
 448 S.E.2d 303
 
 ,
 
 disc. review denied
 
 ,
 
 338 N.C. 516
 
 ,
 
 452 S.E.2d 808
 
 (1994), a respondent at a hearing upon a juvenile petition may be compelled by the petitioner to give testimony even in the absence of a subpoena.
 
 See
 

 id.
 
 at 412,
 
 448 S.E.2d at 305
 
 (holding that despite the respondent's objection to testifying, "DSS was ... free to call [the respondent] to testify as an adverse party when she appeared at the proceeding, and a subpoena was not required").
 

 Thus, this case involves a situation in which Respondent, a compelled witness, invoked the Fifth Amendment when DSS directly asked her who she thought had hurt her child. At the time DSS's attorney propounded this question, child abuse charges were pending against Respondent related to her decision to leave Lily in Matt's care on 7 April 2016. Accordingly, her testimony that she thought Matt had been responsible for the February 2016 injuries to Lily was clearly incriminating as it constituted evidence that she was aware leaving Lily with Matt for a second time created a substantial risk of harm to the child.
 
 See
 

 N.C. Gen. Stat. § 14-318.2
 
 (a) (2015) (providing that a person may be convicted of
 
 *77
 
 child abuse who "allows to be created a substantial risk of physical injury, upon or to such child by other than accidental means ...").
 

 DSS argues that "having voluntarily and knowingly waived her Fifth Amendment privilege, [Respondent] could not then pick and choose which questions she wanted to answer." The fatal flaw with this argument, however, is that it incorrectly applies the Fifth Amendment standard applicable to voluntary witnesses rather than that applicable to compelled witnesses. Because, as discussed above, Respondent was a compelled witness, she did
 
 not
 
 "ha[ve] the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward h[er] version of the facts and h[er] reliability as a witness,
 
 not to testify at all
 
 ."
 
 Brown
 
 ,
 
 356 U.S. at 155
 
 ,
 
 78 S.Ct. at 627
 
 ,
 
 2 L.Ed.2d at 597
 
 (emphasis added).
 

 Our decision in this case is fully consistent with our Supreme Court's recent decision in
 
 Herndon
 
 . In that case, the plaintiff sought a domestic violence protective order ("DVPO") against his wife on the ground that she had secretly drugged his food on several occasions.
 
 Herndon,
 

 368 N.C. at 827
 
 ,
 
 785 S.E.2d at 923
 
 . At the DVPO hearing, the plaintiff presented several witnesses and then rested his case. When the defendant's attorney called the defendant to the stand to testify on her own behalf, the following exchange occurred:
 

 [DEFENSE COUNSEL]: Call [the defendant].
 

 *90
 
 THE COURT: All right. Before we do that, let me make a statement. You're calling her. She ain't going to get up there and plead no Fifth Amendment?
 

 [DEFENSE COUNSEL]: No, she's not.
 

 THE COURT: I want to make sure that wasn't going to happen because you-somebody might be going to jail then. I just want to let you know. I'm not doing no Fifth Amendment.
 

 [DEFENSE COUNSEL]: No.
 

 THE COURT: Okay. Call your witness.
 

 Id.
 
 at 827,
 
 785 S.E.2d at 923-24
 
 .
 

 Following the direct examination of defendant by her counsel, the trial court proceeded to ask her questions regarding the plaintiff's allegations. The trial court subsequently granted the plaintiff's DVPO.
 
 Id.
 
 at 828,
 
 785 S.E.2d at 924
 
 .
 

 *78
 
 On appeal, a divided panel of this Court held that the defendant's Fifth Amendment right against self-incrimination was violated when the trial court required her to choose between "forgoing her right to testify at a hearing where her liberty was threatened or forgoing her constitutional right against self-incrimination."
 
 Herndon v. Herndon
 
 , --- N.C.App. ----, ----,
 
 777 S.E.2d 141
 
 , 144 (2015),
 
 rev'd
 
 ,
 
 368 N.C. 826
 
 ,
 
 785 S.E.2d 922
 
 (2016). Moreover, the majority determined that the trial court had asked questions exceeding the scope of the defendant's testimony on direct examination and that "[t]he trial court's threat to imprison [her] if she invoked her Fifth Amendment rights may have forced [her] to answer these questions differently than she otherwise would have if she felt free to assert that constitutional right."
 

 Id.
 

 at ----,
 
 777 S.E.2d at 145
 
 . For these reasons, the majority vacated the trial court's order and remanded for a new hearing in which the trial court was directed to disregard the defendant's testimony from the previous hearing.
 

 Id.
 

 at ----,
 
 777 S.E.2d at 145
 
 .
 

 The Supreme Court reversed the majority's decision, stating the following:
 

 At no point during direct examination or the trial court's questioning did defendant, a voluntary witness, give any indication that answering any question posed to her would tend to incriminate her
 
 . Put simply, defendant never attempted to invoke the privilege against self-incrimination.... We are not aware of, and the parties do not cite to, any case holding that a trial court infringes upon a witness's Fifth Amendment rights when the witness does not invoke the privilege.
 

 Herndon
 
 , 368 N.C. at 832,
 
 785 S.E.2d at 926
 
 (emphasis added).
 

 Thus, the present case differs from
 
 Herndon
 
 in two critical respects: (1) Respondent here was a compelled witness rather than a witness who voluntarily took the stand as the witness did in
 
 Herndon
 
 ; and (2) unlike the defendant in
 
 Herndon
 
 , Respondent explicitly invoked her Fifth Amendment right when faced with a question that would-and did-elicit an incriminating answer.
 

 Accordingly, we conclude that Respondent was deprived of her constitutional right against self-incrimination when the trial court ordered her to answer the question of DSS's attorney regarding who she thought was responsible for Lily's February 2016 injuries prior to her decision to leave Lily in Matt's care on 7 April 2016. Consequently, the trial court was not permitted to consider her response to this question in the course of making its determination as to whether Lily was an abused juvenile.
 

 *79
 
 Having determined that a Fifth Amendment violation occurred, we must still determine whether Respondent was actually prejudiced.
 
 See
 

 Hill v. Cox
 
 ,
 
 108 N.C.App. 454
 
 , 461,
 
 424 S.E.2d 201
 
 , 206 (1993) ("[E]very violation of a constitutional right is not prejudicial. Some constitutional errors are deemed harmless in the setting of a particular case, where the appellate court can declare a belief that it was harmless beyond a reasonable doubt." (citation, quotation marks, and ellipsis omitted)).
 

 Based on our review of the trial court's order, it appears that (1) the challenged portion of Respondent's testimony likely constituted the primary basis for the trial court's finding that Respondent "did in fact know that [Matt] caused the first round of injuries that her child suffered in February 2016[;]" and (2) this finding, in turn, served as the primary ground for the trial court's adjudication
 
 *91
 
 of Lily as an abused juvenile. Although it is conceivable that the trial court
 
 might
 
 have still made such a finding-and an ensuing adjudication of Lily as an abused juvenile-even in the absence of the testimony elicited in violation of Respondent's right against self-incrimination, we are not at liberty to speculate as to the precise weight the trial court gave to this testimony in reaching its conclusion that Lily was an abused child.
 
 See, e.g.
 
 ,
 
 Alvarez v. Alvarez
 
 ,
 
 134 N.C.App. 321
 
 , 327,
 
 517 S.E.2d 420
 
 , 424 (1999) ("Given our inability to determine the weight that the trial court assigned to these erroneous findings of facts, its use of these findings to support the apparent conclusions of law ... requires the reversal and remand of its judgment." (citation omitted)).
 

 Thus, because we cannot ascertain with any degree of certainty whether the trial court's adjudication of abuse would have been made even absent Respondent's improperly compelled testimony, we are unable to uphold that adjudication. We therefore vacate the adjudication of abuse and remand for further proceedings. On remand, we direct the trial court to disregard the portions of Respondent's testimony at the 12 May 2016 hearing in which she testified to her belief as of 7 April 2016 regarding the source of Lily's injuries from February 2016.
 

 B. Neglect
 

 N.C. Gen. Stat. § 7B-101(15) includes in the definition of a neglected juvenile a juvenile "who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; ... or who is not provided necessary medical care; ... or who lives in an environment injurious to the juvenile's welfare ...." N.C. Gen. Stat. § 7B-101(15). Additionally, "[t]his Court has consistently required that there be some physical, mental, or emotional impairment of the juvenile
 
 *80
 
 or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline in order to adjudicate a juvenile neglected."
 
 In re L.Z.A.
 
 , --- N.C.App. ----, ----,
 
 792 S.E.2d 160
 
 , 168-69 (2016) (citation, quotation marks, and emphasis omitted).
 

 We are satisfied that the trial court made findings supported by competent evidence sufficient to establish that Lily was a neglected juvenile and that those findings were unaffected by the above-referenced Fifth Amendment violation. The trial court found that Respondent made the decision to leave Lily in Matt's care on 7 April 2016 despite knowing that the safety plan in effect at that time specifically barred him from having contact with Lily. Moreover, after learning of the significant injuries to Lily on that date, Respondent waited two days to seek medical treatment for her because of Respondent's concern that DSS would "take [Lily] from me because [Matt] was not supposed to be there...."
 

 These facts adequately support an adjudication of neglect. Indeed, Respondent herself testified as to the distressed state Lily was in on 7 April 2016, including the fact that Lily "was not acting like herself," "had bruises on her," and had one eye "rolled in the back of her head[.]" Respondent's decision to not seek medical attention for two days despite being on notice of Lily's condition fully supports the trial court's adjudication of neglect.
 
 See
 

 State v. Stevens
 
 ,
 
 228 N.C.App. 352
 
 , 357,
 
 745 S.E.2d 64
 
 , 68 ("[A] [parent's] delay in seeking necessary medical care for a child supported the conclusion of law that the child was neglected." (citation and quotation marks omitted)),
 
 appeal dismissed and disc. review denied
 
 ,
 
 367 N.C. 256
 
 ,
 
 749 S.E.2d 886
 
 (2013).
 

 C. Dependency
 

 Respondent next contends that the trial court failed to make adequate findings to support its adjudication of dependency. A "dependent juvenile" is defined, in pertinent part, as one whose "parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement." N.C. Gen. Stat. § 7B-101(9). In order to sustain an adjudication of dependency, "the trial court must address both (1) the parent's ability to provide care or supervision, and (2) the availability to the parent of alternative child care arrangements."
 
 In re P.M
 
 .,
 
 169 N.C.App. 423
 
 , 427,
 
 610 S.E.2d 403
 
 , 406 (2005). "Findings of fact addressing both
 
 *92
 
 prongs must be made before a juvenile may be adjudicated as dependent, and the court's failure to make these findings will result in reversal of the court."
 
 In re B.M
 
 .,
 
 183 N.C.App. 84
 
 , 90,
 
 643 S.E.2d 644
 
 , 648 (2007).
 
 *81
 
 DSS acknowledges that the trial court failed to make findings of fact addressing either of these prongs. Accordingly, we must also vacate the trial court's adjudication of dependency and remand for additional findings on these issues.
 
 See
 
 id.
 

 (remanding for "entry of findings as to the ability of the parent to provide care or supervision and the availability of alternative child care arrangements" (emphasis omitted)).
 

 II. Disposition
 

 Respondent next challenges several aspects of the dispositional portion of the trial court's order. Following an adjudication of neglect, abuse, or dependency, the trial court must enter an appropriate disposition based on the juvenile's best interests.
 
 See
 
 N.C. Gen. Stat. § 7B-903(a) (2015). We review a trial court's determination regarding the best interests of a child under an abuse of discretion standard.
 
 In re A.K.D.
 
 ,
 
 227 N.C.App. 58
 
 , 60,
 
 745 S.E.2d 7
 
 , 9 (2013).
 

 A. Ceasing Reunification Efforts
 

 Respondent contends that the trial court failed to make adequate findings of fact in support of its decision to cease reunification efforts between her and Lily. The pertinent section of the Juvenile Code that governs initial dispositional hearings provides as follows:
 

 (c) If the disposition order places a juvenile in the custody of a county department of social services, the court shall direct that reasonable efforts for reunification as defined in G.S. 7B-101 shall not be required if the court makes written findings of fact pertaining to any of the following:
 

 (1) A court of competent jurisdiction
 
 has determined
 
 that aggravated circumstances exist because the parent has committed or encouraged the commission of, or allowed the continuation of, any of the following upon the juvenile:
 

 a. Sexual abuse.
 

 b. Chronic physical or emotional abuse.
 

 c. Torture.
 

 d. Abandonment.
 

 e. Chronic or toxic exposure to alcohol or controlled substances that causes impairment of or addiction in the juvenile.
 

 *82
 
 f. Any other act, practice, or conduct that increased the enormity or added to the injurious consequences of the abuse or neglect.
 

 N.C. Gen. Stat. § 7B-901(c) (2015) (emphasis added).
 
 [3]
 

 In the present case, the trial court ceased reunification efforts based upon its finding that "this Court has determined that aggravated circumstances exist because [Respondent] has committed or encouraged the commission of, or allowed the continuation of" the aggravated circumstances set forth in N.C. Gen. Stat. § 7B-901(c)(1) b, c, and f.
 

 However, in the recent case of
 
 In re G.T.,
 
 --- N.C.App. ----,
 
 791 S.E.2d 274
 
 (2016),
 
 appeal docketed
 
 , No. 420A16 (N.C. Nov. 17, 2016), a divided panel of this Court construed N.C. Gen. Stat. § 7B-901(c) as follows:
 

 [T]he dispositional court must make a finding that "[a] court of competent jurisdiction has determined" that the parent allowed one of the aggravating circumstances to occur. We conclude that the language at issue is clear and unambiguous and that in order to give effect to the
 
 *93
 
 term "has determined,"
 
 it must refer to a prior court order.
 
 The legislature specifically used the present perfect tense in subsections (c)(1) through (c)(3) to define the determination necessary. Use of this tense indicates that the determination must have already been made by a trial court-either at a previously-held adjudication hearing or some other hearing in the same juvenile case, or at a collateral proceeding in the trial court.
 

 Id.
 

 at ----,
 
 791 S.E.2d at 279
 
 (emphasis added).
 

 We are bound by the majority's decision in
 
 G.T.
 

 See
 

 In re Civil Penalty
 
 ,
 
 324 N.C. 373
 
 , 384,
 
 379 S.E.2d 30
 
 , 37 (1989) ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent,
 
 *83
 
 unless it has been overturned by a higher court."). Here, the trial court's determination as to the existence of aggravating circumstances under N.C. Gen. Stat. § 7B-901(c) appears for the first time in its 5 July 2016 dispositional order rather than in a prior order. Thus, pursuant to
 
 G.T.
 
 , the trial court's conclusion that reasonable reunification efforts must cease pursuant to N.C. Gen. Stat. § 7B-901(c)(1) was erroneous. Accordingly, we vacate that portion of the dispositional order and remand to the trial court.
 

 B. Findings Regarding Appropriate Relative Placements
 

 Finally, Respondent contends that the trial court erred in setting adoption as Lily's permanent plan without making sufficient findings of fact as to whether appropriate relative placements existed for her. Section 7B-903 of the Juvenile Code prescribes the dispositional alternatives available to a trial court following an adjudication of abuse, neglect, or dependency.
 
 See
 
 N.C. Gen. Stat. § 7B-903. Subsection (a1) provides, in pertinent part, as follows:
 

 In placing a juvenile in out-of-home care under this section, the court shall first consider whether a relative of the juvenile is willing and able to provide proper care and supervision of the juvenile in a safe home. If the court finds that the relative is willing and able to provide proper care and supervision in a safe home, then the court shall order placement of the juvenile with the relative unless the court finds that the placement is contrary to the best interests of the juvenile.
 

 N.C. Gen. Stat. § 7B-903(a1).
 

 We have held that a "[f]ailure to make specific findings of fact explaining [why] the placement with the relative is not in the juvenile's best interest will result in remand."
 
 In re A.S.
 
 ,
 
 203 N.C.App. 140
 
 , 141-42,
 
 693 S.E.2d 659
 
 , 660 (2010) (citation omitted). Here, the trial court found that "[r]elatives have been identified as potential placement options for the juvenile. The mother provided the maternal great-aunt [Ms. J.] as a possible placement for the juvenile. The Department is in the process of scheduling a home study for [Ms. J.]." The court also made a finding that "[t]he Department is evaluating relatives, and if the home study on a relative is approved, the child will be placed there or otherwise in a foster home."
 

 Despite these findings, the trial court proceeded to determine that neither custody nor legal guardianship with a relative should be pursued
 
 *84
 
 and instead set the primary permanent plan as adoption along with a concurrent permanent plan of guardianship. We note that the order does not specify whether adoption or guardianship would be with a relative. While the trial court may have been taking a cautious route by waiting for DSS to complete its evaluation of potential relative placements, this did not obviate the need for specific findings of fact under N.C. Gen. Stat. § 7B-903(a1). Because the trial court failed to make the required findings, we vacate and remand this part of the dispositional order in order for the trial court to make appropriate findings concerning Lily's possible placement with relatives.
 

 Conclusion
 

 For the reasons stated above, we affirm the trial court's adjudication of neglect but vacate the trial court's adjudications of abuse and dependency. We also vacate the dispositional portion of the court's 5 July 2016 order with respect to its decision to cease reunification efforts pursuant to N.C. Gen. Stat. § 7B-901(c) and its failure to make
 
 *94
 
 sufficient findings of fact concerning Lily's potential placement with a relative as required by N.C. Gen. Stat. § 7B-903(a1). We remand for further proceedings not inconsistent with this opinion.
 
 [4]
 

 AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH INSTRUCTIONS.
 

 Judges BRYANT and TYSON concur.
 

 [1]
 

 Pseudonyms and initials are used throughout this opinion to protect the identity of the minor child and for ease of reading. N.C. R. App. P. 3.1(b).
 

 [2]
 

 The mere fact that some of the trial court's findings may not be supported in the record constitutes harmless error to the extent that those findings are not required to sustain the trial court's ultimate determinations.
 
 See
 

 In re T.M.
 
 ,
 
 180 N.C.App. 539
 
 , 547,
 
 638 S.E.2d 236
 
 , 240 (2006) (erroneous findings that are unnecessary to support adjudication of neglect do not constitute reversible error).
 

 [3]
 

 We note that N.C. Gen. Stat. § 7B-901(c) was amended by the General Assembly in 2016 to provide that even if the trial court finds that one of the aggravating circumstances set forth in N.C. Gen. Stat. § 7B-901(c)(1) exists, the trial court is not required to cease reunification efforts if it "concludes that there is compelling evidence warranting continued reunification efforts[.]"
 
 See
 

 2016-3 N.C. Adv. Legis. Serv. 49
 
 . That statutory language was made effective 1 July 2016.
 
 See
 

 2016-3 N.C. Adv. Legis. Serv. 302
 
 . However, we apply the version of the statute in effect on the date-12 May 2016-that the trial court held the dispositional hearing and rendered its decision.
 
 See
 

 In re E.M.
 
 , --- N.C.App. ----, ----,
 
 790 S.E.2d 863
 
 , 870 (2016) (applying version of statute in effect when dispositional hearing was held and decision rendered rather than version in effect at time order was filed).
 

 [4]
 

 On remand, the trial court may, in its discretion, choose to take new evidence.
 
 See
 

 In re J.M.D
 
 .,
 
 210 N.C.App. 420
 
 , 428,
 
 708 S.E.2d 167
 
 , 173 (2011) ("Whether on remand for additional findings a trial court receives new evidence or relies on previous evidence submitted is a matter within the discretion of the trial court." (citation and quotation marks omitted)).