628 S.E.2d 753 (2006)
360 N.C. 449
In the Matter of A.K.
No. 139PA05.
Supreme Court of North Carolina.
May 5, 2006.
Richard Croutharmel, Raleigh, for respondent-appellant father.
Michael N. Tousey, Ashville, for appellee Guardian ad Litem.
*754 MARTIN, Justice.
Respondent appeals from the Court of Appeals' decision dismissing as moot his appeal from a trial court order adjudicating his daughter as neglected. We address whether a parent's appeal from a neglect adjudication is rendered moot if the minor child is returned to the parent's custody during the pendency of the appeal.
Respondent is the father of two young daughters: A.K. and C.A.K. The older daughter, C.A.K., was born 11 January 2002. Several weeks after the child's birth, both parents brought her to the emergency room with injuries that, according to her treating physicians, were likely inflicted by a "major force." Respondent and his wife denied they were responsible for C.A.K.'s injuries. Hospital staff reported C.A.K.'s condition to the Buncombe County Department of Social Services (BCDSS or the Department) in accordance with statutory reporting requirements. See N.C.G.S. § 7B-301 (2005) ("Any person... who has cause to suspect that any juvenile is abused, neglected, or dependent ... shall report the case of that juvenile to ... social services.").
On 6 February 2002, BCDSS filed a petition alleging C.A.K. was an abused and neglected juvenile, and custody of C.A.K. was granted to the Department. On 4 September 2002, the trial court adjudicated C.A.K. as neglected and ordered the parents to comply with various conditions to regain custody of C.A.K. The trial court conducted five subsequent review hearings in C.A.K.'s case. At the fifth review hearing on 5 February 2003, *755 the trial court awarded legal guardianship of C.A.K. to her paternal grandparents and released BCDSS from any further responsibility for C.A.K.
Respondent's younger daughter, A.K., was born on 10 May 2003. When BCDSS learned of A.K.'s birth, it filed a petition alleging A.K. was a neglected juvenile. The allegation of neglect was based entirely on the Department's file on C.A.K. The trial court placed A.K. in BCDSS custody on 14 May 2003. A series of custody proceedings concerning A.K. were held between May 2003 and November 2003. In a 17 February 2004 Adjudication and Dispositional Order, the trial court adjudicated A.K. as neglected. The order also provided that although BCDSS would retain legal custody of A.K., her physical placement would be with her parents. Respondent gave written notice of appeal from the Adjudication and Dispositional Order on 26 February 2004.
On 22 November 2004, while respondent's appeal was pending, the trial court restored full custody of A.K. to her parents. The Court of Appeals took judicial notice of the trial court's 22 November 2004 order and dismissed respondent's appeal as moot.
This Court allowed respondent's petition for discretionary review on 30 June 2005. Respondent contends that although he has regained full custody of A.K., there are collateral legal consequences that may arise from a neglect adjudication and, accordingly, this case should not have been dismissed as moot. We agree and therefore reverse and remand.
The principal function of the judicial branch of government is to resolve cases or controversies between adverse parties. See generally U.S. Const. art. III, § 2; N.C. Const. art. I, § 18 and art. IV. When a legal controversy between opposing parties ceases to exist, the case is generally rendered moot and is no longer justiciable. See, e.g., State ex rel. Rhodes v. Gaskill, 325 N.C. 424, 425-26, 383 S.E.2d 923, 924-25 (1989) (per curiam) (holding case was moot because all disputed issues between the parties had been resolved through consent judgment). Ordinarily, an appellate court will decide a case only if the controversy which gave rise to the action continues at the time of appeal. See In re Peoples, 296 N.C. 109, 148, 250 S.E.2d 890, 912 (1978) ("[T]he issue of mootness is not determined solely by examining facts in existence at the commencement of the action. If the issues ... become moot at any time during the course of the proceedings, the usual response should be to dismiss the action."), cert. denied, 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979). This Court explained the general rule as follows:
When, pending an appeal to this Court, a development occurs, by reason of which the questions originally in controversy between the parties are no longer at issue, the appeal will be dismissed [because] this Court will not ... proceed with a cause merely to determine abstract propositions of law or to determine which party should rightly have won in the lower court.
Benvenue Parent-Teacher Ass'n v. Nash Cty. Bd. of Educ., 275 N.C. 675, 679, 170 S.E.2d 473, 476 (1969).
Usually, when the terms of a challenged trial court judgment have been carried out, a pending appeal of that judgment is moot because an appellate court decision "cannot have any practical effect on the existing controversy." Roberts v. Madison Cty. Realtors Ass'n, Inc., 344 N.C. 394, 398-99, 474 S.E.2d 783, 787 (1996). In certain cases, however, the continued existence of the judgment itself may result in collateral legal consequences for the appellant. See, e.g., In re Hatley, 291 N.C. 693, 694-95, 231 S.E.2d 633, 634-35 (1977) (involuntary commitment order); Smith ex rel. Smith v. Smith, 145 N.C.App. 434, 436-37, 549 S.E.2d 912, 913-14 (2001) (domestic violence protective order). Possible adverse consequences flowing from a judgment preserve an appellant's substantial stake in the outcome of the case and the validity of the challenged judgment continues to be a "live" controversy. As a result, an appeal from a judgment which creates possible collateral legal consequences for the appellant is not moot. Hatley, 291 N.C. at 694, 231 S.E.2d at 634.
The relationship of "collateral legal consequences" to the mootness doctrine often arises during the pendency of criminal appeals *756 when the defendant has completed his or her sentence. In such cases, the appellate court decision would presumably have no effect on the punishment already carried out, and the appeal would, pursuant to the general rule, appear to be moot. The effects of a criminal conviction, however, extend far beyond the sentence imposed. The mere fact of conviction may result in various adverse consequences for the individual, including loss of citizenship rights, impeachment if called as a witness, and enhancement of sentencing if convicted of another crime. See, e.g., Carafas v. LaVallee, 391 U.S. 234, 237, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968) ("In consequence of [the defendant's] conviction, he cannot engage in certain businesses; he cannot serve as an official of a labor union . . .; he cannot vote ...; he cannot serve as a juror." (footnotes omitted)). Accordingly, these collateral legal consequences give the defendant-appellant "a substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed on him." Fiswick v. United States, 329 U.S. 211, 222, 67 S.Ct. 224, 91 L.Ed. 196 (1946).
The continued justiciability of appeals involving collateral legal consequences is not limited to criminal cases. A civil appeal is not moot when the challenged judgment may cause collateral legal consequences for the appellant. See, e.g., In re Hatley, 291 N.C. 693, 231 S.E.2d 633 (1977). In Hatley, we considered "whether an appeal from an involuntary commitment order is rendered moot by the discharge of the patient." Id. at 695, 231 S.E.2d at 634. The state contended the appellant's appeal was "moot in light of the fact that the 90-day commitment order under which [the appellant] was institutionalized [had] expired." Id. at 694, 231 S.E.2d at 634. The Court in Hatley noted the challenged commitment order was based in part on a finding the appellant had previously been committed. Id. at 695, 231 S.E.2d at 635. It was therefore possible the challenged commitment order "might likewise form the basis for a future commitment, along with other obvious collateral legal consequences." Id. The Court held the case was not moot, explaining "even when the terms of the judgment below have been fully carried out, if collateral legal consequences of an adverse nature can reasonably be expected to result therefrom, then the issue is not moot and the appeal has continued legal significance." Id. at 694, 231 S.E.2d at 634 (citing Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)).
This Court recently indicated a parent may reasonably expect "collateral legal consequences of an adverse nature" to result from an adjudication of his or her minor child as neglected. In re Barbosa, 357 N.C. 160, 580 S.E.2d 359 (2003). In Barbosa, a mother appealed the trial court's order adjudicating her daughter as neglected to the Court of Appeals. See In re Barbosa, 160 N.C.App. 595, 587 S.E.2d 681, 2003 WL 22289871 (2003) (per curiam). While the appeal was pending at the Court of Appeals, the mother regained custody of her daughter. 2003 WL 22289871, at *1. After the change in custody, the Court of Appeals dismissed the case as moot and the mother sought further review in this Court. See id. We remanded the case to the Court of Appeals "for reconsideration of its order dismissing respondent's appeal as moot, in light of this Court's decision in In re Hatley." In re Barbosa, 357 N.C. 160, 580 S.E.2d 359 (emphasis added). On remand, the Court of Appeals vacated the adjudication order for other reasons, but not before it acknowledged that an adjudication of neglect creates "`collateral consequences'... which could `frequently be revived ...' and could damage the appellant's credibility." 2003 WL 22289871, at *1 (quoting Hatley, 291 N.C. at 695, 231 S.E.2d at 634-35 (citation omitted)).
Barbosa applied the cardinal principal recognized in Hatley to abuse, dependency, and neglect adjudications. It is axiomatic, therefore, that reinstatement of parental custody during the pendency of an appeal challenging a child's neglect or abuse adjudication does not render a case moot as the adjudication may result in collateral legal consequences for the parent.
In North Carolina, juvenile abuse, neglect, and dependency actions are governed by Chapter 7B of the General Statutes, commonly known as the Juvenile Code. Such cases are typically initiated when the local *757 department of social services (DSS) receives a report indicating a child may be in need of protective services. See N.C.G.S. §§ 7B-301, -302 (2005). DSS conducts an investigation, and if the allegations in the report are substantiated, it files a petition in district court alleging abuse, dependency, or neglect. See Id. §§ 7B-302, -400, -403 (2005). The first stage in such proceedings is the adjudicatory hearing. See Id. § 7B-807 (2005). If DSS presents clear and convincing evidence of the allegations in the petition, the trial court will adjudicate the child as an abused, neglected, or dependent juvenile. Id. § 7B-807(a). If the allegations in the petition are not proven, the trial court will dismiss the petition with prejudice and, if the juvenile is in DSS custody, returns the juvenile to the parents. Id.
Immediately following adjudication, the trial court must conduct a dispositional hearing. Id. § 7B-901 (2005). At the hearing, the trial court receives evidence and enters a written order specifying an appropriate plan to meet the needs of the juvenile. See Id. §§ 7B-900, -901, -905 (2005). If the trial court finds it is in the juvenile's best interests, it may place the juvenile in out-of-home care. Id. § 7B-903(a)(2)(c) (2005). If custody of the child is removed from the parent, the trial court must hold a custody review hearing within ninety days and then again within six months. Id. § 7B-906(a) (2005).
Under certain circumstances in abuse, neglect and dependency actions, DSS may file a motion for termination of parental rights. See Id. § 7B-1102(a) (2005). Chapter 7B sets out nine grounds for terminating parental rights, including that "[t]he parent has abused or neglected the juvenile." Id. § 7B-1111(a)(1) (2005).
Respondent contends that A.K.'s neglect adjudication could subject him to various collateral legal consequences under the Juvenile Code. First, respondent asserts that A.K.'s adjudication could be used to support a judicial determination that another child with whom he resides is neglected. "In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile... lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home." Id. § 7B-101(15) (2005). Pursuant to this section, if DSS again alleges that a child in respondent's household is neglected, A.K.'s existing neglect adjudication will be relevant to the court's determination of whether that child is a "neglected juvenile" under Chapter 7B.
The instant case vividly illustrates the significance of a prior adjudication of neglect in finding another child in the same home to be a neglected juvenile. Specifically, the allegation (and adjudication) of neglect regarding A.K. was based entirely on the trial court's previous adjudication of neglect involving respondent's other child, C.A.K.
Guardian ad Litem responds that by virtue of C.A.K.'s uncontested adjudication, any child living with respondent would necessarily be living "in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home." Thus, according to the Guardian ad Litem, A.K.'s neglect adjudication would have no further effect on the application of the Juvenile Code to respondent.
N.C.G.S. § 7B-101(15) provides that, in determining whether a juvenile is neglected, it is relevant that a caretaker in the juvenile's home has previously neglected another child. The statute neither dictates how much weight should be given to a prior neglect adjudication, nor suggests that a prior adjudication is determinative. See, e.g., In re Nicholson, 114 N.C.App. 91, 94, 440 S.E.2d 852, 854 (1994) (holding that "evidence of abuse of another child in the home is relevant in determining whether a child is a neglected juvenile" but noting that the statute "affords the trial judge some discretion in determining the weight to be given such evidence").
Furthermore, the trial court in child custody proceedings is generally vested with broad discretion as to which facts to consider and how much weight to accord them. See, e.g., In re Montgomery, 311 N.C. 101, 112, 316 S.E.2d 246, 253 (1984) (stating that the trial judge's "observation of the parties and the witnesses provided him with an opportunity to evaluate the situation that cannot be *758 revealed on printed page"). Thus, in determining whether a child is a "neglected juvenile" under Chapter 7B, it is well within the trial court's discretion to assign more weight to multiple prior neglect adjudications than it would to just one. Consequently, we reject the Guardian ad Litem's assertion that evidence of more than one prior neglect adjudication would be merely cumulative and would therefore have no additional effect on a trial court's determination of whether a juvenile is neglected.
In the instant case, A.K.'s neglect adjudication would be relevant in any future judicial determination of whether another child in respondent's home is a "neglected juvenile." A.K.'s neglect adjudication could therefore operate to respondent's legal detriment, i.e., "collateral legal consequences of an adverse nature can reasonably be expected to result" from A.K.'s adjudication as neglected. Hatley, 291 N.C. at 694, 231 S.E.2d at 634.
A.K.'s neglect adjudication also creates potential collateral legal consequences for respondent under the Juvenile Code's procedure for termination of parental rights. The trial court is authorized to terminate parental rights when "[t]he parent has abused or neglected the juvenile." N.C.G.S. § 7B-1111(a)(1). "[E]vidence of neglect by a parent prior to losing custody of a child including an adjudication of such neglect is admissible in subsequent proceedings to terminate parental rights." In re Ballard, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984) (emphasis added). "[I]n ruling upon a petition for termination of parental rights for neglect, the trial court may consider neglect of the child by [his or her] parents which occurred before the entry of a previous order taking custody from them." Id. at 713, 319 S.E.2d at 231 (emphasis added) (citing In re Moore, 306 N.C. 394, 293 S.E.2d 127 (1982)). Thus, in a future termination of parental rights proceeding involving A.K., the adjudication at issue in the instant case would constitute evidence of neglect supporting termination of respondent's parental rights.
The Guardian ad Litem contends that A.K.'s neglect adjudication would have no effect in any future proceeding to terminate respondent's parental rights regarding A.K. Under Ballard, any evidence of neglect by the parent is admissible. 311 N.C. at 715, 319 S.E.2d at 232. Therefore, as the Guardian ad Litem notes, the evidence that led to A.K.'s adjudication as neglected could still be considered in a subsequent hearing to terminate respondent's parental rights, regardless of whether the neglect adjudication itself remained. This assertion echoes the Guardian ad Litem's argument with respect to N.C.G.S. § 7B-101(15), and is equally unavailing. We reject the suggestion that a trial court would necessarily view a prior neglect adjudication as merely cumulative in light of other evidence of parental neglect. It is permissible, indeed logical, for a trial court in a termination of parental rights hearing to weigh a prior adjudication of neglect more heavily than mere evidence of neglect.
The adjudication at issue in respondent's appeal would be evidence of neglect in any future proceeding concerning termination of respondent's parental rights in relation to A.K. Again, the adjudication would work to respondent's legal detriment. These potential "collateral legal consequences" for respondent demonstrate that his challenge to A.K.'s adjudication "is not moot and ... has continued legal significance." Hatley, 291 N.C. at 694, 231 S.E.2d at 634.
In summary, the neglect adjudication at issue in the instant case could have adverse consequences for respondent under sections of the Juvenile Code related to child custody and parental rights. The right to parent one's children is a fundamental right, and, thus, determining the validity of a court order that could negatively impact that right is critically important. See, e.g., In re R.T.W., 359 N.C. 539, 543, 614 S.E.2d 489, 491 (2005) ("Parents have a fundamental right to the custody, care, and control of their children."); Owenby v. Young, 357 N.C. 142, 144, 579 S.E.2d 264, 266 (2003) ("[T]he `Due Process Clause ... protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.' This parental liberty interest `is perhaps the oldest of the fundamental liberty interests'...") (quoting Troxel v. Granville, 530 U.S. *759 57, 65, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality)).
An order that, left undisturbed, could later affect a constitutionally-protected liberty interest necessarily involves collateral legal consequences. See, e.g., Smith, 145 N.C.App. at 436, 549 S.E.2d at 914 ("Defendant may suffer collateral legal consequences as a result of the entry of the order ... includ[ing] consideration of the order by the trial court in any custody action involving Defendant.") (emphasis added); see also Williams v. Ragaglia, 261 Conn. 219, 225, 230 n. 12, 802 A.2d 778, 782, 785 n. 12 (2002) (noting that "even an unsubstantiated allegation [of child abuse] would be treated more seriously based on the plaintiff's record of having had her foster care license revoked" and determining that the plaintiff's appeal was not moot because the court could provide "practical relief" to the plaintiff if it overturned the [foster care] license revocation).
A neglect adjudication not only can result in negative legal consequences, but also may detrimentally impact societal and interpersonal relationships. In an analogous case, which held that an appeal from an expired domestic violence protective order was not moot, the Court of Appeals observed:
In addition to the collateral legal consequences, there are numerous non-legal collateral consequences to entry of a domestic violence protective order that render expired orders appealable.... [A]ppeals from expired domestic violence protective orders are not moot because of the "stigma that is likely to attach to a person judicially determined to have committed ... [domestic] abuse."
Smith, 145 N.C.App. at 437, 549 S.E.2d at 914 (quoting Piper v. Layman, 125 Md.App. 745, 753, 726 A.2d 887, 891 (1999) (alteration in original)). Similarly, a stigma is likely to attach to a person who abuses or neglects his or her child. An adjudication under Chapter 7B is a judicial determination that a parent has abused or neglected his or her child. Thus, the consequences of such a determination are considerable, and they give a parent (and indeed the affected child) a continuing stake in determining the validity of the adjudication, even after the parent has regained custody of the child.
This case is readily distinguishable from In re R.T.W., 359 N.C. 539, 614 S.E.2d 489 (2005), in which respondent-mother's appeal from a custody review order was deemed moot based on the trial court's termination of her parental rights during the pendency of the appeal. Id. at 553, 614 S.E.2d at 498. The R.T.W. Court pointed out that if respondent "believe[d] the trial court improperly relied on [the] custody order [at issue in the mooted appeal] during termination proceedings[, she was] free to raise the issue in an appeal of the order terminating parental rights." Id. In the instant case, there is no subsequent termination order through which respondent may collaterally attack A.K.'s adjudication as neglected. As such, respondent's only opportunity to cast off the scarlet letter of A.K.'s adjudication is by prevailing in the instant appeal. Furthermore, in R.T.W., failure to moot the appeal would have allowed "parents [to] indefinitely evade termination proceedings[,] ... a result completely repugnant to [the children's] best interests." Id. at 552, 614 S.E.2d at 497. In contrast, the continued vitality of respondent's instant appeal does not compromise A.K.'s best interests.
In summary, we hold that because a juvenile neglect adjudication can reasonably result in collateral legal consequences, a parent's appeal from such an adjudication is not rendered moot simply because the minor child is returned to his or her parent's custody during the pendency of the appeal.
It is the province of this Court to decide questions of justiciability, but our holding is limited to determining that respondent's appeal is not moot: We express no opinion as to the merits of respondent's appeal or the substantive allegations of neglect in this case. Accordingly, we reverse the Court of Appeals' dismissal of respondent's appeal as moot and remand the case to that court for consideration of the remaining assignments of error.
REVERSED AND REMANDED.
*760 Justice TIMMONS-GOODSON did not participate in the consideration or decision of this case.