IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-299

No. COA20-876

Filed 6 July 2021

Macon County, Nos. 20-JA-9-11

IN THE MATTER OF H.P., I.S., J.S.

Appeal by Respondent-Mother from order entered 19 August 2020 by Judge Thomas Foster in Macon County District Court. Heard in the Court of Appeals 13 April 2021.

*Narain Legal PLLC, by Lucky Narain, for Guardian ad Litem.*

*Wagner Family Law, by Lisa Anne Wagner, for Appellant-Respondent-Mother.*

WOOD, Judge.

¶ 1     Respondent-Mother appeals an order adjudicating her minor children as neglected and dependent juveniles. Because the trial court's order includes contradictory findings and no record evidence resolves those factual issues, we reverse and remand.

## I.     Factual and Procedural Background

¶ 2     Respondent-Mother has three minor children. Howard[1] was born on June 7,

---

[1] *See* N.C. R. App. P. 42(b) (pseudonyms are used to protect the identity of the juveniles).

2011; Ivy was born on February 8, 2013; and Jordan was born on May 4, 2015. The Macon County Department of Social Services ("DSS") first had contact with Respondent-Mother on June 30, 2015, after receiving a report alleging improper discipline, injurious environment, and domestic violence. The report noted Respondent-Mother suffered from post-partum depression. Respondent-Mother participated in mental health services, and DSS closed the case on July 10, 2015

¶ 3        Nearly two years later, on March 27, 2017, DSS received two additional reports regarding the family. The reports alleged "improper supervision, injurious environment, substance abuse, and domestic violence." DSS recommended, but did not provide, Respondent-Mother complete mental health and substance abuse assessments. The case was closed on May 8, 2017.

¶ 4        On September 11, 2017, DSS received an additional report, alleging "injurious environment and domestic violence." According to the report, Respondent-Mother had obtained a domestic violence protective order ("DVPO") against Respondent-Father. The case was closed on October 13, 2017 as "Services Not Recommended [because] the Respondent[-]Mother had obtained a DVPO against the Respondent[-]Father."

¶ 5        Nearly a year later, on August 30, 2018, DSS accepted a report alleging Respondent-Parents continued to have contact with each other, and Respondent-Mother was abusing recreational drugs. The case was closed as there was not enough

evidence to support the allegations. Another report was received on October 31, 2018, alleging domestic violence between Respondent-Parents, that Respondent-Parents suffered from substance abuse, and that Howard expressed suicidal ideations. DSS recommended, but did not provide, mental health and substance abuse assessments. However, as there was insufficient evidence to support the allegations in the report, DSS closed the case.

¶ 6        Another report was received on March 18, 2019, alleging Respondent-Mother and at least one of the juveniles were residing in a storage unit. The case was closed when the social worker determined the family was living in a motel. DSS accepted another report on May 2, 2019, alleging Jordan was found "running around naked in the road . . . and was in the parking lot . . . ." When Jordan was returned home, Respondent-Mother was unresponsive. Respondent-Mother reported "she had 'passed out from a sunburn,' " and "was determined to be dehydrated" with an elevated heart rate. It was further reported that the family was residing in a storage unit, and this allegation appeared to be supported by the social worker's investigation. However, the report also alleged the family had obtained a camper in which to reside, and they would no longer be residing in a storage unit. Because there was insufficient evidence to support the allegations in the report, the case was closed on June 11, 2019.

¶ 7        On January 22, 2020, DSS accepted another report. The report alleged

"Respondent[-]Father was [] mean," and deprived Respondent-Mother of food and drinks. It was further alleged that Respondent-Father made Respondent-Mother hurt her hand, Respondent-Father "almost made [] Respondent[-]Mother kill herself," and Respondent-Mother did not feel safe near Respondent-Father. The children reported they had not had dinner the night before, and Respondent-Mother was starved.

¶ 8        On January 24, 2020, the social worker met with Howard and Ivy. The juveniles reported they did not have food at home and that Respondent-Father took their food. The juveniles informed the social worker that Respondent-Father would not allow them to eat, and that Respondent-Father "gets really mad and is really mean to the Respondent[-]Mother." They told the social worker that Respondent-Mother fed them when she had food in the home.

¶ 9        On the same day, the social worker attempted multiple home visits with the family, but Respondent-Mother would not answer the door. At approximately 8:00 p.m. on January 24, 2020, the social worker was able to complete a home visit. During the visit, Respondent-Mother informed the social worker that Respondent-Father "ate all of the food in front of her and the juveniles and would not let them have any of the food." Respondent-Mother further stated Respondent-Father had moved out of her camper and resided in another camper approximately thirty yards away from Respondent-Mother. Respondent-Mother reassured the social worker "[t]hat she

always makes sure the juveniles eat and said she did not eat for four days so the juveniles could have food to eat." Respondent-Mother also stated she no longer received food stamps "because they were cancelled and she [had] to pay back money before she [could] reapply." Respondent-Mother could not get services from CareNet,[2] because she did not have a copy of the juveniles' social security cards or birth certificates. Respondent-Mother relied on Respondent-Father for transportation. Respondent-Mother requested help from the social worker in "getting the juveniles seen by a pediatrician and getting [Jordan] tested for Autism." Respondent-Mother also expressed her desire for mental health and counseling services for Howard and Ivy. The social worker later attempted a home visit with Respondent-Father and Jordan, but no one answered the door.

¶ 10 In February 2020, the social worker visited the home of Respondent-Mother. When the social worker arrived, he observed Jordan running naked and barefoot in the snow from Respondent-Mother's camper to Respondent-Father's camper. The social worker discussed the importance of warm clothing with Respondent-Father before going to Respondent-Mother's camper. Respondent-Mother was asleep at the time.

---

[2] The record does not provide a description for the services it provides. CareNet's website, however, provides that it is a food assistance program in Macon County, North Carolina. http://maconcarenet.org/

¶ 11        DSS accepted another report on February 10, 2020, alleging Jordan was walking down the street alone in the rain. Respondent-Parents were outside looking for him. A social worker met with the family shortly thereafter, and the family agreed to a safety plan that required the juveniles to be supervised at all times.

¶ 12        On February 15, 2020, DSS accepted a report regarding the family, which stated the juveniles were "very hungry," and had gone to a neighbor's home. The juveniles told their neighbor they did not have any power, water, or food. Howard stated Respondent-Father had disconnected the power cord from his camper to Respondent-Mother's camper. Another report was accepted on February 17, 2020, in which Howard disclosed "he was starving," and there was no food in the home. Ivy stated they did not have food in the home, and they had gone hungry over the weekend. Ivy also disclosed that Respondent-Mother and the juveniles "will have to move to the side of the road soon because the Respondent[-]Father did not pay the rent."

¶ 13        On February 17, 2020, the social worker met with Respondent-Mother and Jordan. During the visit, Respondent-Mother disclosed that there was food in the home, but the refrigerator was broken. Respondent-Mother's camper had power and water. Respondent-Mother and the juveniles expressed fear of Respondent-Father, but Respondent-Mother had no friends or family with whom they could stay. Respondent-Mother expressed an interest in taking the juveniles to stay at the

REACH Shelter[3] if there was an opening. The social worker contacted the REACH Shelter but was informed that Respondent-Mother must contact the shelter herself.

¶ 14 On February 18, 2020, two social workers met with Respondent-Parents. The REACH Shelter had availability for Respondent-Mother and the juveniles if she completed the admission process. Respondent-Father "was hostile and verbally aggressive toward the social workers," and during this interaction, in the Respondent-Father's presence, Respondent-Mother refused to go to the REACH Shelter with the juveniles.

¶ 15 DSS filed petitions alleging Howard, Ivy, and Jordan were neglected and dependent juveniles on February 19, 2020. DSS was granted nonsecure custody. Respondent-Mother was served on February 21, 2020.

¶ 16 On August 19, 2020, the adjudication and disposition hearings were held. Neither Respondent-Parent was present when the matters were called for hearing on adjudication. The trial court proceeded in their absences. One social worker testified, and Respondent-Father arrived during her testimony. The social worker provided, as "Exhibit A," the attachment to the juvenile petition. Exhibit A was a summary of DSS's history with the family, inclusive of all reports DSS received. Exhibit A consists of thirty-seven allegations, four of which state there was insufficient evidence

---

[3] The Macon County REACH Shelter is a shelter for domestic violence, sexual assault, and human trafficking victims. https://www.reachofmaconcounty.org/

to support other allegations in the exhibit. At the hearing, the trial court orally adjudicated the juveniles neglected and dependent and adopted the contents of Exhibit A as findings of fact in its adjudication order. The trial court's findings of fact include the allegations dismissed by DSS because there "was not evidence to support" such allegations. Several other findings of fact are verbatim recitations of the allegations contained within Exhibit A.

¶ 17    Thereafter, the court continued to disposition. Respondent-Mother arrived just prior to the close of DSS's evidence on disposition; however, she did not testify at the hearing. DSS's evidence consisted of a foster care worker's testimony, DSS's court report prepared for the dispositional hearing, and Exhibit A. Although the record on appeal contains a court report prepared by the Guardian *ad Litem*, the transcript does not reflect that this report was introduced at the disposition hearing. At the conclusion of the hearing, the trial court entered a written adjudication and disposition order, containing forty-seven findings of fact. This order was pre-prepared in advance of the hearing by DSS. The order provided the court with the opportunity to circle whether Respondent-Parents were present at the adjudication and disposition hearing. Many of the order's findings of fact are verbatim recitations of allegations from DSS's Exhibit A. Several of the factual findings are more appropriately designated conclusions of law. The trial court ordered reunification as the primary permanent plan for the juveniles with a concurrent plan of guardianship.

Respondent-Mother timely appealed.[4]

## II.    Standard of Review

"In North Carolina, juvenile abuse, neglect, and dependency actions are governed by Chapter 7B of the General Statutes, commonly known as the Juvenile Code." *In re A.K.*, 360 N.C. 449, 454, 628 S.E.2d 753, 756 (2006). "Such cases are typically initiated when the local department of social services (DSS) receives a report indicating a child may be in need of protective services." *Id.* at 454, 628 S.E.2d at 756-57. "DSS conducts an investigation, and if the allegations in the report are substantiated, it files a petition in district court alleging abuse, dependency, or neglect." *Id.* at 454, 628 S.E.2d at 757.

"The first stage in such proceedings is the adjudicatory hearing." *Id.* "If DSS presents clear and convincing evidence of the allegations in the petition, the trial court will adjudicate the child as an abused, neglected, or dependent juvenile." *Id.* at 454–55, 628 S.E.2d at 757; *see also* N.C. Gen. Stat. § 7B-807 (2020). "The adjudicatory hearing shall be a judicial process designed to adjudicate the existence or nonexistence of any of the conditions alleged in a petition. In the adjudicatory hearing, the court shall protect the rights of the juvenile and the juvenile's parent to assure due process of law." N.C. Gen. Stat. § 7B-802 (2020).

---

[4] Respondent-Father did not appeal.

We review adjudication orders to determine "(1) whether the findings of fact are supported by clear and convincing evidence, and (2) whether the legal conclusions are supported by the findings of fact." *In re C.B.*, 245 N.C. App. 197, 199, 783 S.E.2d 206, 208 (2016) (citation omitted); *see also* N.C. Gen. Stat. § 7B-805 (2020). "In a non-jury neglect adjudication, the trial court's findings of fact supported by clear and convincing competent evidence are deemed conclusive, even where some evidence supports contrary findings." *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997). The trial court's conclusions of law are reviewed *de novo*. *In re D.H.*, 177 N.C. App. 700, 703, 629 S.E.2d 920, 922 (2006) (citation and internal quotation marks omitted). A disposition order is reviewed to determine whether the trial court abused its discretion in deciding what action is in the juvenile's best interest. *In re C.W.*, 182 N.C. App. 214, 219, 641 S.E.2d 725, 729 (2007).

## III. Discussion

Respondent-Mother raises several issues on appeal. Each will be addressed in turn.

### A. The Trial Court's Findings of Fact

Respondent-Mother first argues the trial court erred when it incorporated the allegations in the juveniles' petitions as findings of fact in the adjudicatory order, as the allegations are not supported by competent evidence. We agree.

The Juvenile Code provides that adjudication orders "shall contain appropriate

findings of fact and conclusions of law." N.C. Gen. Stat. § 7B-807(b). Rule 52 of our rules of civil procedure mandates the trial court make findings of "facts specially and state separately its conclusions of law thereon. . . ." N.C. Gen. Stat. § 1A-1, Rule 52. "[T]he trial court's factual findings must be more than a recitation of allegations. They must be the specific ultimate facts . . . sufficient for the appellate court to determine that the judgment is adequately supported by competent evidence." *In re Anderson*, 151 N.C. App. 94, 97, 564 S.E.2d 599, 602 (2002) (citing *Montgomery v. Montgomery*, 32 N.C. App. 154, 156-57, 231 S.E.2d 26, 28 (1977)). It is "not *per se* reversible error for a trial court's fact findings to mirror the wording of a petition or other pleading prepared by a party. . . . this Court will examine whether the record of the proceedings demonstrates that the trial court, through processes of logical reasoning, based on the evidentiary facts before it, found the ultimate facts necessary to dispose of the case." *In re J.W.*, 241 N.C. App. 44, 48-49, 772 S.E.2d 249, 253, *disc. review denied*, 368 N.C. 290, 776 S.E.2d 202 (2015). "Ultimate facts are the final resulting effect reached by processes of logical reasoning from the evidentiary facts." *In re Anderson*, 151 N.C. App. at 97, 564 S.E.2d at 602; *see also In re H.J.A.*, 223 N.C. App. 413, 418, 735 S.E.2d 359, 363 (2012).

¶ 24 Here, the trial court made forty-seven findings of fact in the adjudication order. However, many of the findings of fact in the adjudication order are mere recitations of the allegations in Exhibit A that was attached to the juvenile petition, and the trial

court failed to properly make findings of ultimate facts necessary to dispose of the case. Several of the trial court's findings are verbatim recitations of the allegations in the juvenile petition. Four of the trial court's findings expressly state that "there was not evidence" to support other allegations the trial court found as fact in the adjudication order. For example, finding of fact 16 states

> 16. That on October 31, 2018 the Department accepted a report regarding the family, which alleged that there was a domestic violence situation between the Respondent[-]Mother and Respondent[-]Father [] the previous week wherein Respondent[-]Father [] threw an ashtray at the Respondent[-]Mother and the juveniles, which missed them but shattered against a wall; that the Respondent[-]Mother did not have any way to leave Respondent[-]Father [] and needed help; that the juvenile, [Howard], stated to the Respondent[-]Mother that he just wanted to kill himself; that Respondent[-]Father [] was verbally abusive toward the juvenile, [Howard], and told the juvenile to "get the [expletive omitted] out"; that the Respondent[-]Mother was being harassed constantly by Respondent[-]Father []; and that the Respondent[-]Parents were using substances and that Respondent[-]Father [] admitted to being addicted to heroin and methamphetamines.

Finding of fact 17 states

> 17. That Former Social Worker Timan investigated the allegations and worked with the family. There *was not evidence found throughout the investigation to substantiate the reported allegations.* However, there continued to be many concerns regarding this family. The case was closed on December 11, 2018 as Services Recommended because it was recommended that the Respondent[-]Parents complete mental health and substance abuse assessments

and comply with recommendations resulting from those assessments. (emphasis added).

Although not explicitly stated, three other findings of fact by the trial court recognize that there was insufficient evidence to support the allegations accepted as fact in other findings. Specifically, the trial court's finding of fact 15 states there was insufficient evidence to support finding of fact 14; finding of fact 17 states there was insufficient evidence to support finding of fact 16; finding of fact 21 states there was insufficient evidence to support finding of fact 20, although it is unclear which concerns were unsupported. Finding of fact 18 states DSS received a report that the family was residing in a storage unit; however, finding of fact 19 states DSS investigated the allegation and the family resided in a motel. The contents of Exhibit A are contradictory on its face and, therefore, not competent evidence.

¶ 25 At the adjudication and disposition hearing, the trial court heard testimony from a DSS social worker, who summarized Exhibit A's contents. The social worker testified about alleged substance abuse issues that could not be substantiated by DSS. No evidence, other than Exhibit A, was presented at the adjudication and disposition hearing. By DSS's own evidence, several of the allegations contained within Exhibit A were dismissed by DSS as there was not enough evidence to support them.

¶ 26 The trial court's findings may not be mere recitations of the allegations of

neglect or dependency. *See In re Anderson*, 151 N.C. App. at 97, 564 S.E.2d at 602 ("[T]he trial court's . . . findings must be more than a recitation of allegations"); *In re O.W.*, 164 N.C. App. 699, 702, 596 S.E.2d 851, 853 (2004). As no evidence to support the allegations in Exhibit A was presented at the adjudication and disposition hearing, and several of the allegations in Exhibit A could not be substantiated, we hold the trial court did not, "through [the] process[] of logical reasoning," find ultimate facts necessary to dispose of the case. *See In re J.W.*, 214 N.C. App. at 48, 772 S.E.2d at 253.

¶ 27        Additionally, several of the trial court's findings reflect statements made to DSS during its investigation. Two of the trial court's findings summarize what the children reported to social workers. Three of the findings describe statements made by Respondent-Mother to a social worker while seeking assistance. An additional finding mirrors an allegation in Exhibit A, and reflects statements made by a DSS social worker. Lastly, one of the trial court's findings reflects statements by Respondent-Parents' neighbors. Most of these findings state that DSS received or accepted reports wherein it was alleged by various people that certain things had occurred. The findings do not reflect that DSS found the statements to be true, and the trial court did not make a determination as to the veracity of the allegations or statements made. None of these individuals testified at the hearing.

¶ 28        Respondent-Mother argues these findings are "reiterations of statements made

to DSS during its investigation[.]" These statements were not corroborated by any of the testimony given at the adjudication hearing. We agree with Respondent-Mother's contention that the trial court's findings may not be "mere[] recitations of statements made to DSS." The trial court must, through the process of logical reasoning, make findings with respect to "the ultimate facts necessary to dispose of the case." *See In re J.W.*, 241 N.C. App. at 48, 772 S.E.2d at 253; *In re Anderson*, 151 N.C. App. at 96-97, 564 S.E.2d at 601-02.

¶ 29        The Guardian *ad Litem* argues this Court should affirm the adjudication order as Respondent-Mother "placed the children in an environment that was injurious to their health." The Guardian *ad Litem* asserts that Respondent-Mother and the juveniles were residing in a storage unit for an unspecified period of time. DSS investigated this allegation, and found the family was not residing in a storage unit, but in a motel. Although DSS accepted a second report that the family was residing in a storage unit, the trial court, while still reciting Exhibit A, subsequently found that "the Respondent[-]Parents obtained a camper to reside in and would no longer be residing in the storage unit." Furthermore, without evidence of the conditions of the storage unit or other access to necessities, we hold that taking temporary shelter in a storage unit is not *per se* neglect.

¶ 30        The Guardian *ad Litem* asserts Respondent-Mother's broken refrigerator "created an inability to reliably provide the children with proper nutrition." However,

the trial court did not make such a finding. The trial court found, in relevant part, "Respondent-Mother reported . . . that the refrigerator was broken, and they couldn't store anything in the refrigerator," although Respondent-Mother's camper had both power and water. The gap between the trial court's finding about the refrigerator, with no mention of nutrition, and the Guardian *ad Litem*'s assertion regarding lack of nutrition exemplifies the difference between a finding that recites the evidence and a finding that resolves a material issue of ultimate fact. The Guardian *ad Litem*'s arguments are without merit.

## B. The Trial Court's Conclusions of Law

Next, Respondent-Mother contends that several of the trial court's findings of fact are more properly considered conclusions of law. We agree.

"Facts are things . . . that can be objectively ascertained. . . . Facts, in turn provide the bases for conclusions." *In re M.R.D.C.*, 166 N.C. App. 693, 697, 603 S.E.2d 890, 892-93 (2004) (internal citations omitted). Determinations which require an exercise of judgment are more properly designated conclusions of law. *In re J.V.*, 198 N.C. App. 108, 117, 679 S.E.2d 843, 848 (2009); *Plott v. Plott*, 313 N.C. 63, 74, 326 S.E.2d 863, 869-70 (1985). The trial court's findings that are more appropriately designated conclusions of law are reviewed as such. *See In re N.G.*, 186 N.C. App. 1, 12-13, 650 S.E.2d 45, 52-53 (2007), *aff'd per curiam*, 362 N.C. 229, 657 S.E.2d 355 (2008). We review the trial court's conclusions of law to determine if they are

supported by its findings of fact. *See In re C.B.*, 245 N.C. App. at 199, 783 S.E.2d at 208.

¶ 33     Here, Respondent-Mother contends the following determinations, labeled findings of fact by the trial court, are more appropriately considered conclusions of law:

> 41. That the juveniles are neglected juveniles pursuant to N.C. Gen. Stat. §7B-101(15) and dependent juveniles pursuant to N.C. Gen. Stat. §7B-101(9).
>
> 42. That the Macon County Department of Social Services has made reasonable efforts to prevent or eliminate the need for placement of the juveniles . . . .
>
> 43. That by their actions and inactions, the Respondent[-]Parents have forfeited their constitutionally protected status as parents and their entitlement to the legal presumption that they, as the natural biological parents, are the most fit and proper persons to have custody, care, and control of the juveniles.
>
> 44. That the juveniles continue to require more adequate care than the Respondent[-]Parents can provide.
>
> 45. That the return of the juveniles to the home of the Respondent[-]Parents is contrary to the health, safety, and welfare of the juveniles at this time.
>
> 46. That it is in the best interests of the juveniles for the Department to maintain and have the authority to consent to all medical, surgical, dental, orthodontic, psychological, psychiatric, mental health, and education needs of the juveniles, as well as the statutory authority granted by N.C. Gen. Stat. §7B-904.

Respondent-Mother contends that "[e]ach of these enumerated findings of fact is more

properly considered and reviewed as a conclusion of law." As such, Respondent-Mother asks, "this Court [to] apply the *de novo* standard of review to these mischaracterized findings to determine whether they are supported by adequate findings of fact." We agree that these findings are more properly designated conclusions of law and review them as such. *See In re D.H.*, 177 N.C. App. at 703, 629 S.E.2d at 922 (the trial court's conclusions of law are reviewed *de novo*).

¶ 34 The determinations of neglect, dependence, reasonable efforts, and best interests require the application of legal principles and the exercise of judgment. *See In re Helms*, 127 N.C. App. at 510-11, 491 S.E.2d at 675-76 (citing *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984)). Therefore, these findings are more properly designated conclusions of law. We review the trial court's conclusions of law to determine if they are supported by the trial court's findings of fact, which must be founded upon competent evidence. *See In re C.B.*, 245 N.C. App. at 199, 783 S.E.2d at 208.

### 1. *The trial court's conclusion that the juveniles are neglected and dependent*

¶ 35 Finding of fact 41 concludes that the juveniles are neglected and dependent juveniles.

¶ 36 Section 7B-101(15) of our general statutes defines a "neglected juvenile" as "any juvenile . . . whose parent . . . does not provide proper care, supervision, or

discipline . . . or who lives in an environment injurious to the juvenile's welfare[.]" N.C. Gen. Stat. § 7B-101(15) (2020). To adjudicate a juvenile neglected, "some physical, mental, or emotional impairment of that juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline," is required. *In re Safriet*, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993); *In re C.M.*, 183 N.C. App. 207, 210, 644 S.E.2d 588, 592 (2007). A "dependent juvenile" is one whose "parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement." N.C. Gen. Stat. § 7B-101(9). An adjudication of dependency requires the trial court to "address both (1) the parent's ability to provide care or supervision, and (2) the availability to the parent of alternative child care arrangements." *In re P.M.*, 169 N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005). "Findings of fact addressing both prongs must be made before a juvenile may be adjudicated as dependent, and the court's failure to make these findings will result in reversal of the court." *In re L.C.*, 253 N.C. App. 67, 80, 800 S.E.2d 82, 91-92 (2017); *In re B.M.*, 183 N.C. App. 84, 90, 643 S.E.2d 644, 648 (2007).

¶ 37 Although the family had a history with DSS, many of the allegations investigated by DSS were not supported by sufficient evidence, and the cases were closed. DSS failed to present any evidence that Howard, Ivy, and Jordan suffered any physical, mental, or emotional harm. No evidence suggested, and the trial court

did not find, the children were underweight or malnourished, although DSS expressed concern about their access to food. Similarly, there was no evidence or finding that Respondent-Mother could not provide water or heat in her home. Concerns of such issues do not translate into facts without clear and convincing evidence to support the concerns.

¶ 38 DSS did not present evidence, and the trial court did not make any ultimate factual findings, regarding Respondent-Mother's ability to provide for the minor children's care or supervision. Nor did the trial court find that the children lacked an appropriate alternative child care arrangement. The trial court's conclusion that the minor children are neglected and dependent juveniles is not supported by its findings.

¶ 39 There are two substantive findings by the trial court that remain uncontested. First, Jordan was observed running between his parents' homes naked. Secondly, Jordan was walking alone prior to the parents' entry into a safety plan. These facts, by themselves, do not constitute negligence on behalf of Respondent-Parents. Further, had these acts arisen from Respondent-Parents' negligence, "not every act of negligence on the part of parents or other care givers constitutes 'neglect' under the law and results in a 'neglected juvenile.'" *In re Stumbo*, 357 N.C. 279, 283, 582 S.E.2d 255, 258 (2003). These two incidents by themselves do not constitute neglect or dependency. Although Respondent-Mother has a history of involvement with DSS,

the majority of the allegations remain unsubstantiated. The trial court did not find the minor children had experienced or were at risk of experiencing any physical, mental, or emotional harm. Thus, the trial court's conclusions that the minor children are neglected and dependent are not supported by its findings of fact.

### 2. *The trial court's conclusion that DSS made reasonable efforts*

¶ 40    Finding of fact 42 concludes DSS "made reasonable efforts to prevent or eliminate the need for placement of the juveniles. . . ."

¶ 41    "Our General Assembly requires social service agencies to undertake reasonable, not exhaustive, efforts towards reunification." *In re: A.A.S, A.A.A.T., J.A.W.,* 258 N.C. App. 422, 430, 812 S.E.2d 875, 882 (2018). "Reasonable efforts" is defined as "[t]he diligent use of preventive or reunification services by a department of social services when a juvenile's remaining at home or returning home is consistent with achieving a safe, permanent home for the juvenile within a reasonable period of time." N.C. Gen. Stat. § 7B-101(18).

¶ 42    A thorough review of the record and transcript shows Respondent-Mother's history with DSS, consisting of DSS accepting reports, investigating the allegations, and ultimately closing the case files due to its determination that insufficient evidence existed to substantiate the allegations. In more than one instance, DSS recommended, but did not provide, services to Respondent-Mother. DSS attempted to connect Respondent-Mother to the REACH Shelter but sought removal of the

minor children when Respondent-Mother, in the presence of her alleged abuser, refused to take them to the REACH Shelter. Further, the record is devoid of DSS's effort to connect the family with alternative food sources once their supplemental nutrition assistance program ("SNAP") benefits were suspended. The evidence presented at the adjudication and disposition hearing was insufficient to support the finding that DSS made reasonable efforts to prevent the juveniles' removal from the familial home.

## IV. Conclusion

We reverse the adjudication order and remand for dismissal of the juvenile petition. As we reverse the adjudication order, we need not reach the merits of Respondent-Mother's appeal of the trial court's disposition order.

REVERSED AND REMANDED.

Judge MURPHY concurs.

Judge INMAN concurs in part and dissents in part in a separate opinion.

INMAN, Judge, concurring in part and dissenting in part.

I concur with the majority's conclusion that the trial court failed to resolve the conflicts in the evidence and make the ultimate findings of fact necessary to support DSS's neglect or dependency petitions. However, because in my view the appropriate mandate is to reverse and remand the order for further proceedings, I respectfully dissent.

## V.   Ultimate Findings

The majority correctly holds that, in simply reciting the allegations of the petitions, the trial court failed to make findings of ultimate fact "reached by processes of logical reasoning from the evidentiary facts." *In re Anderson*, 151 N.C. App. 94, 97 564 S.E.2d 599, 602 (2002) (quotation marks and citation omitted). This mere repetition of DSS's allegations is inadequate absent other findings stating which circumstances, as found by the trial court, sufficed to demonstrate neglect or dependency. *See, e.g., In re S.C.R.*, 217 N.C. App. 166, 169-70, 718 S.E.2d 709, 712 (2011) (reversing and remanding an adjudicatory petition that simply recited the allegations of the petition because "[t]he trial court made no findings . . . linking any of respondent's actions to dependency or neglect"). When the trial court errs in this manner, the appropriate disposition is to reverse the adjudication and disposition orders and remand for further findings of fact. *Id.* at 170, 718 S.E.2d at 712; *see also Anderson*, 151 N.C. App. at 100, 564 S.E.2d at 603 (reversing and remanding for further findings of ultimate fact).

## VI.    Neglect, Dependency, and Reasonable Efforts

¶ 46    The majority goes further than remanding this matter for proper determination by the trial court as the finder of fact, and holds that no evidence introduced below could possibly support findings demonstrating (1) neglect or dependency, or (2) reasonable efforts by DSS to prevent or eliminate the need for placement of the children with DSS.  I disagree with this further analysis.[5]

### 3. *Neglect or Dependency*

¶ 47    The majority holds that the record evidence could not support findings sufficient to demonstrate neglect or dependency.  For example, it asserts that because "no evidence suggested . . . the children were underweight or malnourished" and no evidence substantiated DSS's concerns about food access, even if the trial court had made necessary ultimate findings of fact, it would be error to adjudicate the children neglected.  However, Exhibit A attached to the petitions—received by the trial court as substantive evidence without objection—included repeated mention of food insecurity issues in statements by the juveniles, which were recounted in the adjudication order's findings of fact.  Both Exhibit A and the adjudication order

---

[5] It should be noted that Respondent-Mother, who was represented by counsel at all times during the adjudication hearing, at no point contested the petition filed by DSS. Counsel presented no evidence, conducted no cross-examination, made no objections, and offered no argument to the trial court in opposition to an adjudication of neglect or dependency.  To the contrary, her lone response to DSS's argument was to correct an inadvertent misstatement by DSS's counsel that the petition also asserted abuse.

disclose numerous statements by Howard and Ivy that show all three children went hungry for days at a time and lacked ready access to food. While some of those statements indicate that Respondent-Mother made efforts in the face of a domineering and abusive father, they also demonstrate that the children faced continuing food insecurity issues despite those efforts.[6] Exhibit A further states that Respondent-Mother had lost access to SNAP benefits, and that DSS had "previously provided . . . Food and Nutrition Services, but no longer does so because of a substantiated fraud investigation."

---

[6] Howard stated on one occasion that "I was so hungry I was shaking. I was starving Saturday. There is no food. I tried to look for food and couldn't find any. Mom told me sorry and she was trying her best." He also reported that "Dad makes me, mom, and my brother starve." Ivy likewise stated that "every day he [The Respondent Father] lets us go hungry and we starve," and on one occasion she went 48 hours with only a single sandwich to eat. Howard and Ivy both told DSS directly:

> That [School Resource Officer] Tom Pruett had given the family some canned food yesterday because they did not have food at home. . . . Respondent Father does not get them food, and the Respondent Mother cannot get them food because she doesn't have a car. . . . Respondent Father makes them starve, and . . . they were shaking really badly because they were so hungry. . . . The juvenile, [Jordan], doesn't get to eat either and he also has to starve.

It appears Mother tried to feed her children in the face of Respondent-Father's domination. But the statutory mandate to protect children from neglect and dependency does not require finding fault with a parent. *See, e.g., In re Montgomery*, 311 N.C. 101, 109, 316 S.E.2d 246, 252 (1984) ("In determining whether a child is neglected, the determinative factors are the circumstances and conditions surrounding the child, not the fault or culpability of the parent.").

¶ 48        Hillary Shockley, the social worker who helped draft Exhibit A, also testified at trial that much of the information in the several reports to DSS came directly from the children, who raised the issue of lack of food with her personally. When asked if the children's statements were inconsistent with one another or ever changed in such a way as to "cause . . . concern with their truthfulness," she testified that the children's statements were consistent and never changed.

¶ 49        Notwithstanding the above, the majority holds that the record evidence cannot support the grounds alleged in the petition. It offers three reasons to disregard Exhibit A: (1) "the contents of Exhibit A are contradictory on its face and, therefore, not competent evidence[;]" (2) the trial court did not expressly find the statements therein credible; and (3) none of the witnesses who gave the statements testified at the hearing. None of these reasons supports the result reached by the majority.

¶ 50        The majority asserts that contradictions in Exhibit A render it incompetent as a matter of law. To the extent that Exhibit A—which largely recites the history of reports received by DSS and the results of DSS's investigations into those reports— contains contradictions, they are not for us to reconcile. Having received Exhibit A into evidence without objection from Respondent-Mother, the trial court is the sole tribunal with authority to resolve conflicts in the evidence. *See, e.g., Coble v. Coble*, 300 N.C. 708, 712-13, 268 S.E.2d 185, 189, (1980) ("The trial court must itself determine what pertinent facts are actually established by the evidence before it, and

it is not for an appellate court to determine *de novo* the weight and credibility to be given to evidence disclosed by the record on appeal." (citations omitted)); *Carolina Mulching Co. v. Raleigh-Wilmington Investors II, LLC*, 272 N.C. App. 240, 246, 846 S.E.2d 540, 545 (2020) ("This Court does not resolve issues of credibility or conflicting evidence." (citation and quotation marks omitted)).

¶ 51 We may not usurp the trial court's role as the finder of fact. To the extent that the adjudication order fails to include ultimate findings based on evaluation of the probative value and credibility of the evidence presented below, the trial court should be given the opportunity to resolve that deficiency by entering proper ultimate findings on remand. This Court ordered exactly that in *In re Gleisner*, 141 N.C. App. 475, 539 S.E.2d 362 (2000), because the trial court's adjudication order—as here—consisted of "findings [that] are simply a recitation of the evidence presented at trial, rather than ultimate findings of fact." 141 N.C. App. at 480, 539 S.E.2d at 365. We did not hold, as the majority does here, that the entire petition must be dismissed without an opportunity for the trial court to correct its error. Instead, recognizing that "it is the duty of the trial judge to consider and weigh all of the competent evidence, and to determine the credibility of the witnesses and the weight to be given their testimony," *id.*, we remanded the matter "with instructions to make ultimate findings of fact based on the evidence." *Id.* at 481, 539 S.E.2d at 366.

¶ 52 Respondent-Mother's failure to object to hearsay statements by the children

received into evidence waived any challenge to that evidence on appeal. *See, e.g., In re Isenhour*, 101 N.C. App. 550, 553, 400 S.E.2d 71, 73 (1991) ("Respondent also contends that the court erred in basing these findings on evidence that was not 'substantive' or was hearsay. Respondent failed to raise these objections at trial, however, and must be considered to have waived them.").

¶ 53 Our Supreme Court recently has made clear that hearsay statements to DSS shall be considered competent evidence on appellate review when no objection to their admission was lodged at trial. *See In re J.C.L.*, 374 N.C. 772, 775, 845 S.E.2d 44, 49 (2020) (holding a finding of fact based solely on a hearsay statement to DSS was supported by competent evidence because "[r]espondent did not raise any objection, either on a hearsay ground or upon any other basis, to the social worker's testimony at trial").

¶ 54 Because Exhibit A was introduced into evidence without objection and it discloses the potential existence—if so found by proper ultimate findings made by the trial court—of at least one of the grounds alleged in the petition, I cannot join the majority in requiring the petition be dismissed.[7]

---

[7] The evidence of food insecurity, unavailability of SNAP benefits, Respondent-Father's hoarding of what food is available in the home, and lack of DSS food services due to a substantiated fraud investigation, discussed above in the context of neglect, is also relevant to a determination of dependency. *See* N.C. Gen. Stat. § 7B-101(9) (2019) (defining "Dependent juvenile" as "[a] juvenile in need of assistance or placement because . . . the

### 4. *Reasonable Efforts*

I also dissent from the majority's determination that the trial court erred in concluding DSS failed to make "reasonable efforts to prevent or eliminate the need for placement of the juveniles" with DSS. Notably, Respondent-Mother has not challenged that determination in her briefs to this Court. She only argues that any conclusion *as to neglect or dependency* is unsupported by adequate findings and competent evidence. Our Supreme Court has cautioned us that "[i]t is not the role of the appellate courts . . . to create an appeal for an appellant[,]" *Viar v. N.C. Dept. of Transp.*, 359 N.C. 400, 402, 610 S.E.2d 360, 361 (2005), and "[i]t is not our role . . . to supplement and expand upon . . . arguments of a party filing a brief. . . . We address only those issues which are clearly and understandably presented to us." *Hill v. Hill*, 229 N.C. App. 511, 514-15, 748 S.E.2d 352, 356 (2013). Absent any assertion of error by Respondent-Mother on the issue of reasonable efforts by DSS, I cannot join the majority's decision to *sua sponte* review the question.

I also disagree with the majority's analysis on the merits regarding this issue. The majority holds DSS failed to exercise reasonable efforts to address the children's food insecurity because "the record is devoid of DSS's effort to connect the family with alternative food sources once their [SNAP] benefits were suspended." Both Exhibit

---

juvenile's parent . . . is unable to provide for the juvenile's care . . . and lacks an appropriate alternative child care arrangement").

A and the trial court's order disclose why, as DSS had previously "[p]rovided Medicaid and Food and Nutrition services, *but no longer does so due to a substantiated fraud investigation.*" I would not hold that, in order to show reasonable efforts, DSS was required to continue to provide food services in the face of substantiated fraud, particularly when other evidence showed that the children went hungry even when there was food in the home because Respondent-Father deprived the children of whatever food was available.

¶ 57      The record evidence tends to show that Respondent-Mother may have been victimized by Respondent-Father. But consistent with the purpose of child protective statutes, her relative role with respect to deprivation of their children is not a basis to deny a petition to adjudicate them neglected or dependent. *Montgomery*, 311 N.C. at 109, 316 S.E.2d at 252.

## VII.     Conclusion

¶ 58      For the foregoing reasons, I concur in the majority's holding that the trial court erred in failing to make the ultimate findings of fact in its adjudication order. However, because I disagree with the majority's remaining holdings that (1) nothing in the record could support any ground stated in the petitions, and (2) DSS failed to make reasonable efforts to prevent or eliminate the need for placement of the children, I would remand the matter to the trial court to make any necessary ultimate findings to support whatever determination it reaches from the record evidence. I

respectfully dissent as to those holdings.