IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-654

No. COA21-285

Filed 7 December 2021

Rockingham County, No. 20 JA 108

IN THE MATTER OF R.B.

Appeal by Respondent from order entered 1 February 2021 by Judge Erica S. Brandon in Rockingham County District Court. Heard in the Court of Appeals 6 October 2021.

*Lisa Anne Wagner for Respondent-Appellant-Mother.*

*Stam Law Firm, PLLC, by R. Daniel Gibson, for Guardian ad Litem.*

*No brief filed on behalf of Rockingham County Department of Social Services, Petitioner-Appellee.*

WOOD, Judge.

Respondent-Mother appeals an order adjudicating her minor child, Riley,[1] neglected and dependent and continuing non-secure custody with Rockingham County Department of Social Services ("DSS"). On appeal, Respondent-Mother contends the trial court erred in adjudicating Riley neglected and dependent and

---

[1] A pseudonym is used to protect the identity of the juvenile(s). *See* N.C. R. App. P. 42.

abused its discretion in continuing non-secure custody with DSS. After careful review of the record and applicable law, we reverse the adjudication order.

## I.    Factual and Procedural Background

¶ 2        Respondent-Mother has one child, Riley, born on August 15, 2017. Respondent-Mother has a history of depression and anxiety. In December 2019, Respondent-Mother was having difficulty getting Riley to sleep independently and called several friends and a parenting hotline for support. Respondent-Mother felt overwhelmed and exhausted and believed it would be best for another adult to be in the home until she rested. Ultimately, Respondent-Mother called 9-1-1 due to her exhaustion.[2] Law enforcement arrived to Respondent-Mother's residence, and "didn't see a problem in the home."

¶ 3        Thereafter, one of Respondent-Mother's friends picked Riley up and kept him for a few days. During this time, Respondent-Mother voluntarily underwent a mental health evaluation and began therapy. Another friend of Respondent-Mother's traveled from Baltimore to stay with Respondent-Mother "in the event that it was determined" Respondent-Mother needed supervision. Shortly thereafter, Riley returned to Respondent-Mother's care.

---

[2] Respondent-Mother testified she called 9-1-1 "out of an abundance of caution," and that law enforcement officers "were confused as to why [she] called them." Respondent-Mother further testified that law enforcement officers did not see a problem in the home.

¶ 4        Also in December 2019, Respondent-Mother befriended Ms. D. Ms. D and her four-year-old daughter resided with Respondent-Mother for approximately one month during the Covid-19 pandemic. After Ms. D moved out of Respondent-Mother's residence, Respondent-Mother had additional difficulty getting Riley to sleep independently. Respondent-Mother attempted to arrange respite care for Riley but these arrangements fell through for various reasons.

¶ 5        On June 7, 2020, Respondent-Mother was suffering from exhaustion and depression.[3] Respondent-Mother texted Ms. D, "I have two black eyes[4] from him kicking me in the head. He has been screaming and banging on the door all night and I have not slept in 22 hours and I swear to God I think I'm going to kill him." Respondent-Mother further texted that she "want[ed] to strangle the [expletive omitted] lights out of him"; she "[expletive omitted] hate[d] his guts [she] hated the [expletive omitted] guts and [she] hope[d] he [expletive omitted] chokes a [expletive omitted] hate every never lets me sleep"; she "hate[d] being a mom it's the worst"; and Riley "could fend for himseld [sic] and [she] wil sray [sic] in [her] room." Respondent-Mother expressed her frustration to Ms. D and her feeling that no one understood the difficulty she was experiencing. Specifically, Respondent-Mother

---

[3] Respondent-Mother testified she was "deeply-depressed and sleep-deprived."

[4] Respondent-Mother did not have two black eyes on June 7, 2020.

sent a text message to Ms. D stating, "Everyone keeps just telling me that it's normal and I'm [sic] keep telling everybody that I literally had my hands around his throat because I can't [expletive omitted] take it anymore but nobody wants to hear it."[5]

¶ 6     Ms. D testified that she "didn't take [Respondent-Mother's messages] literally,"[6] and did not believe Respondent-Mother would harm Riley or herself at the time she received the text messages. Respondent-Mother testified these messages were "hyperbole and blowing off steam." After Respondent-Mother sent Ms. D these messages, Riley went to stay with Ms. D for approximately one week. Respondent-Mother periodically messaged Ms. D throughout the week to inquire about Riley's well-being and picked Riley up on June 14, 2020. Ms. D later testified that she had some reservations about returning Riley to Respondent-Mother's care, "not because [Ms. D] didn't think that she could do it. [Ms. D] just didn't think she could do it at that time" due to her mental state. Nonetheless, she ultimately returned Riley to the care of Respondent-Mother, because "she's the mother. And ultimately, [Ms. D is] just another human being. It's not for [her] to say. [She] can only have an opinion and that doesn't make [her] the person who can make the decision."

---

[5] Additional text messages included hyperbolic language, including that Riley "ripped the door off the hinges."

[6] When asked, "[Y]ou didn't take [Respondent-Mother] seriously about what she said?", Ms. D testified "I mean, obviously, I took it as she was frustrated." Ms. D further testified, "Oh no. God, no. I didn't take it literally," when asked if she believed Respondent-Mother stated she would kill Riley.

¶ 7        Shortly after Riley returned to Respondent-Mother's care, Respondent-Mother and Ms. D got into an argument unrelated to Riley's care. Around this same time, Ms. D was contacted by DSS, and she provided DSS with screenshots of Respondent-Mother's text messages from June 7, 2020.

¶ 8        On June 17, 2020, social workers visited Respondent-Mother's home. Respondent-Mother did not allow the social worker into her home, but allowed Ms. N, a community behavioral health counselor, into the residence. Ms. N spent approximately thirty minutes in Respondent-Mother's residence talking to her before determining Respondent-Mother did not need to be involuntarily committed.

¶ 9        After Ms. N exited the residence, she, the social worker, and law enforcement remained in Respondent-Mother's driveway discussing the visit. Ms. N, the social worker, and law enforcement sat in their vehicles for approximately two and a half hours before the social worker took non-secure custody of Riley. Riley was temporarily placed in foster care before returning to Respondent-Mother's residence with Respondent-Mother under the supervision of his maternal grandmother.

¶ 10       After Riley was temporarily removed from Respondent-Mother's care, she contacted her therapist and voluntarily underwent a psychological evaluation. Her therapist recommended she continue therapy and comply with all of DSS's recommendations. In response to her therapist's recommendations, Respondent-Mother continued therapy throughout the adjudication.

On June 17, 2020, more than a week after Respondent-Mother sent Ms. D the text messages, DSS filed a juvenile petition alleging Riley was a neglected and dependent juvenile. The adjudication hearing occurred over three days: October 12, 2020, November 5, 2020, and December 3, 2020. On November 5, 2020, Respondent-Mother moved to dismiss the juvenile petition, but the court denied her motion. Riley's appointed Guardian *ad litem* submitted a report recommending Riley be returned to Respondent-Mother's care. Specifically, the Guardian *ad litem* reported

> In my short time as a GAL, I have not encountered another parent like [Respondent-Mother]. She uses appropriate language with her son, has displayed age-appropriate discipline, and overall, appears to be a very good mother. She repeats regularly that she wants what is best for her son, always. I think that extenuating circumstances of excessive isolation during the pandemic must be taken into consideration in this case.
>
> In every call I have with the family, [Respondent-Mother's] behavior with her son is exemplary. This was also true during what had to be a very stressful time from the audio recording I listened to that was recorded by [Respondent-Mother] on the day that DSS removed [Riley] from the home. [Respondent-Mother] remained a present and engaged parent even as her mental health was in question by the DSS staff member, [Ms. N]. [Respondent-Mother] has stated time and time again that [Riley] comes first. When she feels like depression might overtake her, she seeks care of [Riley.] . . .
>
> . . .
>
> [Respondent-Mother] appears to be directly dealing with her known and acknowledged mental health issues and HAS dealt with those issues without harm to her child

and of her own volition, without outside intervention, [f]rom her history and from her dogged determination to clear her name in this case, she appears to have a firm grasp on what being a parent means. In every single interaction I have had with the family, the mother is directly engaged with her son, pays attention to his requests, disciplines appropriately when necessary, and interacts positively with him no matter what is going on.

Included in the record on appeal are several letters drafted by Respondent-Mother's friends advocating for Riley's return to Respondent-Mother's care. These letters were drafted in June 2020 and include the following language: "The way [Respondent-Mother] is with [Riley] is beautiful and heartwarming. . . . She would bend over backwards if there was any possible threat to [Riley]"; Riley "is [Respondent-Mother's] world. I know firsthand that [Respondent-Mother] is a BRILLIANT mother"; "I could never imagine [Respondent-Mother's] love and ability to care for [Riley] would ever be argued"; and "[Respondent-Mother] is a remarkable mother: doting affectionate, and emotionally intuitive to her son's needs."

¶ 12 The trial court orally adjudicated Riley a neglected and dependent juvenile and proceeded to disposition on December 3, 2020. On February 1, 2021, the trial court entered its written adjudication and disposition order, in which it adjudicated Riley a neglected and dependent juvenile and found "the juvenile's return to his/her own home would be contrary to the juvenile's best interests." The trial court continued non-secure custody with DSS, but placed Riley "in the home of his mother, . . . under

constant supervision of the maternal grandmother." Respondent-Mother timely filed

a written notice of appeal on February 11, 2021.

## II.  Discussion

Respondent-Mother appeals from the adjudication and disposition order.

> In North Carolina, juvenile abuse, neglect, and dependency
> actions are governed by Chapter 7B of the General
> Statutes, commonly known as the Juvenile Code. Such
> cases are typically initiated when the local department of
> social services (DSS) receives a report indicating a child
> may be in need of protective services. DSS conducts an
> investigation, and if the allegations in the report are
> substantiated, it files a petition in district court alleging
> abuse, dependency, or neglect. The first stage in such
> proceedings is the adjudicatory hearing. . . . If the
> allegations in the petition are not proven, the trial court
> will dismiss the petition with prejudice and, if the juvenile
> is in DSS custody, returns the juvenile to the parents.

*In re A.K.*, 360 N.C. 449, 454-55, 628 S.E.2d 753, 756-57 (2006) (citations omitted).

"The adjudicatory hearing shall be a judicial process designed to adjudicate the

existence or nonexistence of any of the conditions alleged in a petition. In the

adjudicatory hearing, the court shall protect the rights of the juvenile and the

juvenile's parent to assure due process of law." N.C. Gen. Stat. § 7B-802 (2020). "The

allegations in a petition alleging that a juvenile is abused, neglected, or dependent

shall be proved by clear and convincing evidence." N.C. Gen. Stat. § 7B-805 (2020).

"Immediately following adjudication, the trial court must conduct a dispositional

hearing." *In re A.K.*, 360 N.C. at 455, 628 S.E.2d at 757 (citing N.C. Gen. Stat. § 7B-

901 (2005)).

We review adjudication orders to determine "(1) whether the findings of fact are supported by clear and convincing evidence, and (2) whether the legal conclusions are supported by the findings of fact." *In re C.B.*, 245 N.C. App. 197, 199, 783 S.E.2d 206, 208 (2016) (citation omitted); s*ee also* N.C. Gen. Stat. § 7B-805.

> [W]hen a trial judge sits as both judge and juror, as he or she does in a non-jury proceeding, it is that judge's duty to weigh and consider all competent evidence, and pass upon the credibility of the witnesses, the weight to be given their testimony and the reasonable inferences to be drawn therefrom.

*In re Whisnant*, 71 N.C. App. 439, 441, 322 S.E.2d 434, 435 (1984) (internal quotation marks omitted). Given the deference we give to our trial courts in non-jury proceedings, we do not reweigh the evidence; "the trial court's findings of fact supported by *clear and convincing* competent evidence are deemed conclusive, even where some evidence supports contrary findings." *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997) (citation omitted) (emphasis added). "Clear and convincing evidence 'is greater than the preponderance of the evidence standard required in most civil cases.' " *In re Smith*, 146 N.C. App. 302, 304, 552 S.E.2d 184, 186 (2001) (citation omitted). "It is defined as evidence which should fully convince." *Id.* (citation and internal quotation marks omitted).

"Unchallenged findings are binding on appeal." *In re C.B.*, 245 N.C. App. at

199, 783 S.E.2d at 208 (citing *In re C.B.*, 180 N.C. App. 221, 223, 636 S.E.2d 336, 337 (2006), *aff'd*, 361 N.C. 345, 643 S.E.2d 587 (2007)). The court's "conclusions of law are reviewed *de novo*." *In re. D.H.*, 177 N.C. App. 700, 703, 629 S.E.2d 920, 922 (2006) (citation omitted). A disposition order is reviewed to determine whether the trial court abused its discretion in deciding what action is in the juvenile's best interest. *In re C.W.*, 182 N.C. App. 214, 219, 641 S.E.2d 725, 729 (2007).

The Juvenile Code provides that adjudication orders "shall contain appropriate findings of fact and conclusions of law." N.C. Gen. Stat. § 7B-807(b) (2020). Rule 52 of our rules of civil procedure mandates that the trial court make findings of "facts specially and state separately its conclusions of law thereon. . . ." N.C. Gen. Stat. § 1A-1, Rule 52. "[T]he trial court's factual findings must be more than a recitation of allegations. They must be the specific ultimate facts . . . sufficient for the appellate court to determine that the judgment is adequately supported by competent evidence." *In re Anderson*, 151 N.C. App. 94, 97, 564 S.E.2d 599, 602 (2002) (citing *Montgomery v. Montgomery*, 32 N.C. App. 154, 156-57, 231 S.E.2d 26, 28 (1977)).

It is "not *per se* reversible error for a trial court's fact findings to mirror the wording of a petition or other pleading prepared by a party. . . . [T]his Court will examine whether the record of the proceedings demonstrates that the trial court, through processes of logical reasoning, based on the evidentiary facts before it, found the ultimate facts necessary to dispose of the case." *In re J.W.*, 241 N.C. App. 44, 48-

49, 772 S.E.2d 249, 253, *disc. review denied*, 368 N.C. 290, 776 S.E.2d 202 (2015) (citation omitted). "Ultimate facts are the final resulting effect reached by processes of logical reasoning from the evidentiary facts." *In re Anderson*, 151 N.C. App. at 97, 564 S.E.2d at 602 (citation omitted); *see also In re H.J.A.*, 223 N.C. App. 413, 418, 735 S.E.2d 359, 363 (2012) (citation omitted).

## A. Adjudication of Neglect

¶ 18          Respondent-Mother first argues the trial court erred in adjudicating Riley a neglected juvenile. We agree.

> The purpose of the adjudication hearing is to determine the existence of the juvenile's conditions as alleged in the petition. *In re A.B.*, 179 N.C. App. 605, 609, 635 S.E.2d 11, 14 (2006); N.C. Gen. Stat. § 7B-802 (2015). At this stage, the court's decisions must often be 'predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case.'

*In re E.P.-L.M.*, 272 N.C. App. 585, 593, 847 S.E.2d 427, 434 (2020) (quoting *In re McLean*, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999)). Section 7B-101(15) of our general statutes defines a "neglected juvenile" as "[a]ny juvenile . . . whose parent . . . does not provide proper care, supervision, or discipline . . . or who lives in an environment injurious to the juvenile's welfare." N.C. Gen. Stat. § 7B-101(15) (2020). To adjudicate a juvenile neglected, "some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure

to provide proper care, supervision, or discipline" is required. *In re Safriet*, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993) (citation and internal quotation marks omitted); *In re C.M.*, 183 N.C. App. 207, 210, 644 S.E.2d 588, 592 (2007) (citation omitted); *In re E.P.-L.M.*, 272 N.C. App. at 596, 847 S.E.2d at 436 (citation omitted). "Similarly, in order for a court to find that the child resided in an injurious environment, evidence must show that the environment in which the child resided has resulted in harm to the child or a substantial risk of harm." *In re K.J.B.*, 248 N.C. App. 352, 354, 797 S.E.2d 516, 518 (2016) (citation omitted). In adjudicating a child neglected, "the circumstances and conditions surrounding the child," not "the fault or culpability of the parent," are "what matters." *In re Z.K.*, 375 N.C. 370, 373, 847 S.E.2d 746, 748-49 (2020) (citation omitted).

¶ 19    Here, the trial court's order is in a "check box" format, in which the trial court "checked" the following findings of fact:

> 12. After receiving evidence, the Court finds: facts as alleged in the Juvenile Petition which was filed by [DSS] and which appears in the juvenile's court file. Said copy of the Juvenile Petition is incorporated herein by reference and its allegations are found as fact by the Court. These facts are also set out in the attached page or pages (entitled "Additional Findings of Fact").
>
> . . .
>
> 13. The juvenile, [Riley,] is neglected, in that the juvenile . . . lives in an environment injurious to the juvenile's welfare. . . . The juvenile is at risk of future abuse, neglect

or dependency.

In the trial court's "Additional Findings of Fact," the court recites, verbatim, the allegations of the juvenile petition. Respondent-Mother challenges the following facts contained therein:

> On or about June 14, 2020, [DSS] received a neglect report on the minor child based on injurious environment. Specifically, the reporter was concerned over the safety of the minor child based on the mother's mental health. The child was placed in the care of [Ms. D] by the mother because the mother was having a mental health crisis. After a couple of days, [Ms. D] attempted to return the child to the mother, but the mother refused to take the child. . . . The mother asked a friend for help in trying to find the child an adoptive home. The mother finally picked the child up from [Ms. D] on Sunday.
>
> . . . The mother is refusing to cooperate with the [social worker]. The mother would only speak to [the social worker] through the screen door. The [social worker] could see the minor child inside the home. The mother did willingly let [Ms. N] into the home so that [Ms. N] could assess the mother's mental health. The mother is refusing to make a plan of care for the minor child as the mother states the child is safe. The mother advised the [social worker] that the mother is not cooperating because the [social worker] is a bully and a liar.
>
> The mother has CPS history based on her mental health issues. . . .

¶ 20    The trial court's findings of fact regarding the alleged "injurious environment" are limited to those regarding Respondent-Mother's mental health. The trial court made no factual findings regarding any prior harm Riley suffered, nor did it make

any findings regarding a substantial risk of harm. *In re K.J.B.*, 248 N.C. App. at 354, 797 S.E.2d at 518. (citation omitted). "Where there is no finding that the juvenile has been impaired or is at substantial risk of impairment, there is no error if all the evidence supports such a finding." *In re Padgett*, 156 N.C. App. 644, 648, 577 S.E.2d 337, 340 (2003) (citation omitted); *see also In re K.J.B.*, 248 N.C. App. at 354, 797 S.E.2d at 518 ("A trial court's failure to make specific findings regarding a child's impairment or risk of harm will not require reversal where the evidence supports such findings." (citation omitted)).

¶ 21 Although the trial court made findings regarding Respondent-Mother's mental health and Ms. D's fear for Riley's wellbeing, many of these findings are unsupported by competent evidence. For example, the trial court found that Respondent-Mother refused to make a plan of care for Riley, but the evidence showed that Respondent-Mother had an established Temporary Safety Plan ("TSP") that she did not feel she needed to activate. The court further found Ms. D attempted to return Riley to Respondent-Mother's care and Respondent-Mother refused; however, Ms. D testified she did not tell DSS that she attempted to return Riley to Respondent-Mother's care prior to June 14, 2020.

¶ 22 Finding of fact 12 merely incorporates the allegations contained in Exhibit A as factual findings. Although it is "not *per se* error for a trial court's fact findings to mirror the wording of a petition," the trial court is mandated to find "the ultimate

facts necessary to dispose of the case." *In re J.W.*, 241 N.C. App. at 48-49, 772 S.E.2d at 253 (citation omitted). As the evidence presented tended to contradict the allegations in the petition, we hold the trial court's findings of fact regarding the alleged neglect are unsupported by competent evidence. *See In re Anderson*, 151 N.C. App. at 97, 564 S.E.2d at 602 ("[T]he trial court's . . . findings must be more than a recitation of allegations."); *In re O.W.*, 164 N.C. App. 699, 702, 596 S.E.2d 851, 853 (2004) (citation omitted). Further, the trial court's fact findings also include, "See Exhibit B which is incorporated by reference." "Exhibit B" is not attached to the order. It is clear the trial court's findings are no "more than a recitation of the allegations" contained in Exhibit A, as the language is identical. The trial court failed to make its own ultimate findings of facts.

¶ 23        Moreover, the trial court did not make any factual findings regarding the injurious environment in which it believed Riley resided. The evidence tends to show that the only alleged "threats of harm to the child" made by Respondent-Mother were in the text messages she sent to Ms. D; however, both the sender and the receiver of the texts testified that they neither meant nor took the texts literally. Although not required to do so, the trial court did not address the approximately ten-day long time frame between Respondent-Mother's text messages and DSS intervention. We emphasize, "in order for a court to find that the child resided in an injurious environment, evidence must show that the environment in which the child resided

*has resulted in harm* to the child or a *substantial risk* of harm." *In re K.J.B.*, 248 N.C. App. at 354, 797 S.E.2d at 518 (citation omitted) (emphasis added). There is no evidence in the record before us that Riley suffered prior harm while in the care of Respondent-Mother. The trial court made no factual findings regarding substantial risk of future harm to Riley; rather it impermissibly adopted DSS's allegation that Respondent-Mother "made threats of harm toward the child." Where both parties testified at trial that the texts were not meant literally when sent nor taken literally when received, we decline to hold that the text messages Respondent-Mother sent to Ms. D standing alone, constitute clear and convincing evidence of a substantial risk of harm toward Riley. While we agree the trial court is in a better position to determine the credibility of the witnesses than the appellate court is based on the cold record, *see In re Whisnant*, 71 N.C. App. at 441, 322 S.E.2d at 435, when, as here, the trial court fails to make the ultimate findings of fact necessary to dispose of the case or support the conclusion that Riley is a neglected juvenile, we must reverse the adjudication order and remand to the trial court.

¶ 24    This Court reversed an adjudication of neglect and abuse where the mother sent a friend "Yahoo" messages about killing her children. *See In re L.L.*, No. COA11-1460, 220 N.C. App. 416, 2012 WL 1514870, at *1, 4 (unpublished). Specifically, the mother sent messages stating, "i need a break from it all"; "im about to fukn lose it"; and "ima fukn kill em both." *Id.* at *1. During her psychiatric evaluation, the mother

"told the physician she made the threatening statements because she was 'severely stressed' and thought she could 'vent' to her best friend." *Id.* In reversing the adjudication order, this Court reasoned, "[t]he evidence does show that the mental health professional who examined [the mother] for involuntary commitment found that [the mother] displayed no evidence of a desire to harm herself or her children," and the messages were "written three weeks earlier while [the mother] was 'venting' to a friend." *Id.* at *4.

Likewise, in *In re A.O.T.*, No. COA19-168, 268 N.C. App. 323, 2019 WL 5726809, this Court vacated an adjudication of neglect where the mother "shook the bassinet in which the baby was contained" and feared "she was going to hurt the child"; the mother admitted she "scream[ed] and curs[ed] at the child"; and the mother sent text messages to the child's father in which she stated, "I shook him again cause he's being [expletive omitted] annoying" and "I [expletive omitted] hate him . . . I'm about to throw him/ I will [expletive omitted] kill him." *Id.* at *3. There, the trial court made further findings regarding the mother's post-partum depression and messages that she hit the baby and "threw him off" her. *Id.* Although the mother "did not actually" harm the child, "she wanted the . . . father to think that she actually had shaken the baby." *Id.* This Court vacated the adjudication order, stating, "[T]he [trial] court made no finding of any 'physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment' as required by our case law." *Id.*

(citations omitted). In vacating the adjudication, this Court reasoned that, "in light of [the] [m]other's testimony that her text messages to [the] [f]ather were not true and merely an attempt to get his attention, we cannot say 'all the evidence supports . . . a finding' that [the juvenile] was either harmed or at a substantial risk of harm in his mother's care." *Id.* at *4 (citation omitted). We find the reasoning in *In re L.L.*, and *In re A.O.T.*, persuasive and adopt it herein.

¶ 26        In the present appeal, Respondent-Mother sent text messages to a close friend, messages which Ms. D testified she "didn't take literally." Respondent-Mother testified she was "venting," "blowing off steam," and that the messages were hyperbole and exaggeration. Respondent-Mother had a history of anxiety and depression, and stated she was "deeply-depressed and sleep-deprived" at the time the messages were sent. More than a week passed from the time Respondent-Mother sent the text messages until DSS arrived at the residence to evaluate Respondent-Mother for involuntary commitment. Ms. N, the community behavioral health counselor who questioned Respondent-Mother about her mental health, did not believe Respondent-Mother should be involuntarily committed. If Ms. N had determined that Respondent-Mother posed a danger to herself or others, she would have presumably recommended Respondent-Mother be involuntarily committed. Other evidence presented showed that Respondent-Mother was aware of her mental health needs and sought assistance and respite care for her child when she believed

it to be necessary. The trial court made no factual findings regarding whether Riley was harmed in his mother's care or whether there was a substantial risk that he would be harmed. Accordingly, we "cannot say 'all the evidence supports a finding that [Riley] was either harmed or at a substantial risk of harm in his mother's care." *See id.*; *see also In re L.L.*, 2012 WL 1514870, at *4; *In re T.X.W.*, No. COA 17-855, 258 N.C. App. 204, 2018 WL 944766 (reversing an adjudication of neglect and dependency where the mother was diagnosed with mental illness and believed her friend was plotting to have DSS take the children away where "there was no evidence that [the minor children] were actually harmed or faced a substantial risk of harm while in [the mother's] care."). Based on the review of the cold record, we are not persuaded that the evidence presented at the hearing rises to the level of such evidence that would "fully convince" a fact finder that Riley suffered harm or a substantial risk of harm in his mother's care. However, we recognize that the trial court is in a better position to determine the credibility of the witnesses and to resolve the inconsistencies in the evidence. Because the trial court did not make the ultimate findings of fact regarding the risk of harm Riley faced, we remand to the trial court for the court to make any additional findings of fact which may support its conclusion that Riley is a neglected juvenile or for the trial court to dismiss the petition in absence of such findings.

**B. Adjudication of Dependency**

¶ 27        Respondent-Mother further contends the trial court erred in adjudicating Riley dependent.  We agree.

¶ 28        A "dependent juvenile" is one whose "parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement."  N.C. Gen. Stat. § 7B-101(9).  An adjudication of dependency requires the trial court to "address both (1) the parent's ability to provide care or supervision, and (2) the availability to the parent of alternative child care arrangements."  *In re P.M.*, 169 N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005).  "Findings of fact addressing both prongs must be made before a juvenile may be adjudicated as dependent, and the court's failure to make these findings will result in reversal of the court."  *In re L.C.*, 253 N.C. App. 67, 80, 800 S.E.2d 82, 91-92 (2017) (citation omitted); *In re B.M.*, 183 N.C. App. 84, 90, 643 S.E.2d 644, 648 (2007).

¶ 29        Regarding dependency, the trial court made the following findings of fact:

> 12. After receiving evidence, the Court finds: facts as alleged in the Juvenile Petition which was filed by [DSS] and which appears in the juvenile's court file.  Said copy of the Juvenile Petition is incorporated herein by reference and its allegations are found as fact by the Court.  These facts are also set out in the attached page or pages (entitled "Additional Findings of Fact").
>
> . . .
>
> 13. . . . The juvenile, [Riley], is dependent, in that the juvenile needs assistance or placement because the juvenile has no parent, guardian, or custodian responsible

for the juvenile's care or supervision. [T]he juvenile's parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement.

In the trial court's additional findings, the court found that "[t]he child is dependent in that he does not have a parent who is capable of providing safe care or supervision to the child."

After careful review, we hold finding of fact 13 is more appropriately classified as a conclusion of law. *See In re Helms*, 127 N.C. App. at 510, 491 S.E.2d at 675 ("As a general rule, . . . any determination requiring the exercise of judgment . . . or the application of legal principles . . . is more properly classified a conclusion of law." (citations omitted)). Accordingly, the only finding of fact regarding Riley's alleged dependency is the trial court's additional finding that Riley "does not have a parent who is capable of providing safe care or supervision." This finding, however, does not address the second prong of a dependency determination. The trial court's order is devoid of factual findings regarding an alternative child care arrangement. We note, however, that there is evidence in the record from multiple sources that Respondent-Mother sought respite care for the minor child as she believed necessary. Consequently, we reverse the adjudication of dependency for the trial court's failure to consider the second prong.

### III. Conclusion

After careful review, we reverse the adjudication order finding the juvenile to be a neglected and dependent juvenile. We remand to the trial court for additional findings of fact to support the trial court's finding of neglect or for the trial court to dismiss the petition in the absence of such findings. Because we reverse the adjudication order, we need not address the dispositional order.

REVERSED AND REMANDED.

Judge ZACHARY concurs.

Judge CARPENTER concurs in part and concurs in result only in part by separate opinion.

No. COA21-285– *In re R.B.*

CARPENTER, Judge, concurring in part and concurring in result only in part.

I fully concur with the majority's conclusion with respect to the issue of adjudication of dependency. I respectfully concur in result only on the issue of neglect adjudication, and I write separately to differentiate my reasoning from that of the majority in reaching the decision to reverse and remand. Regarding the trial court's adjudication of neglect, I agree with the majority's holding that "[t]he trial court made no factual findings regarding whether Riley was harmed in his mother's care or whether there was a substantial risk that he would be harmed." *See In re K.J.B.*, 248 N.C. App. 352, 354, 797 S.E.2d 516, 518 (2016) ("[I]n order for a court to find that the child resided in an injurious environment, evidence must show that the environment in which the child resided has resulted in harm to the child or a substantial risk of harm.") (citation omitted). I further agree the trial court failed to "f[ind] the ultimate facts necessary to dispose of the case" "through processes of logical reasoning." *See In re J.W.*, 241 N.C. App. 44, 48–49, 772 S.E.2d 249, 253, *disc. rev. denied*, 368 N.C. 290, 776 S.E.2d 202 (2015) (citation omitted). Instead, the trial court simply recited verbatim the allegations from DSS's petition. *See In re M.K.*, 241 N.C. App. 467, 470–71, 773 S.E.2d 535, 538–39 (2015). However, for the following reasons, I disagree with the analysis of the majority opinion with respect to whether there is sufficient evidence in the record for the trial court to find Riley resided in an injurious environment.

*CARPENTER, J., concurring in part and concurring in result only in part.*

¶ 33        This Court reviews a trial court's adjudicatory decision "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372, N.C. 388, 392, 831 S.E.2d 49, 52 (2019) (citation omitted). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379, 831 S.E.2d 305, 310 (2019) (citation omitted).

¶ 34        As an initial matter, I note the trial court was not required to making findings of fact regarding the credibility of witnesses or resolve inconsistences in the evidence—the trial court *was* required to "find the ultimate facts essential to support the conclusions of law." *See In re J.W.*, 241 N.C. App. at 48, 772 S.E.2d at 253.

¶ 35        The majority appears to decline to hold there is sufficient evidence in the record that would permit the trial judge to find the child suffered a substantial risk of harm in his mother's care by weighing the evidence and assessing the credibility of the witnesses presented at trial. It is not this Court's role to weigh evidence and determine the credibility of witnesses. *See In re Whisnant*, 71 N.C. App. 439, 441, 322 S.E.2d 434, 435 (1984) ("[I]t is [within the trial court] judge's duty to weigh and consider all competent evidence, and pass upon the credibility of the witnesses, the weight to be given their testimony and the reasonable inferences to be drawn

*CARPENTER, J., concurring in part and concurring in result only in part.*

therefrom.") (citing *Knutton v. Cofield*, 273 N.C. 355, 160 S.E.2d 29 (1968)).  By doing so, it appears this Court is stepping into the shoes of the trial court judge.

¶ 36          Seemingly disregarded by the majority is record evidence and the plain language of text messages that were received in evidence in which Respondent-Mother admits to taking a step toward harming the child—which was consistent with her threats. In her text messages, Respondent-Mother stated, *inter alia*, she: "*want[ed] to strangle the [expletive omitted] lights out of [her child]*," was "going to have to abandon him," was "going to hurt him," was "going to kill him" and "*literally had [her] hands around his throat*."  (Emphasis added). The majority declines to conclude these text messages could be found by the trial judge to be clear and convincing evidence that Riley was at a substantial risk of harm based on the Respondent-Mother's and Ms. D's testimony.  Rather, the majority appears to re-weigh evidence and determine witness credibility, as evidenced by the majority's description of Respondent-Mother's text messages as including "hyperbolic language" and its presumption that Respondent-Mother did not pose a substantial risk of harm to Riley because Respondent-Mother was not involuntarily committed following DSS's evaluation.

¶ 37          I note the record also includes testimony of Ms. D on 12 October 2020 that she "absolutely" had reservations about returning Riley to the care of his mother after Respondent-Mother agreed to place Riley in a "safe home" through a foster care

program. Ms. D was hesitant to return the child to Respondent-Mother "because [she] didn't think that [Respondent-Mother] could [care for the child]" based on "all the stuff she said and texted [her] and telling [her] that [she] was trying to find [Riley a home]." The majority focuses its attention on testimony provided by Ms. D at the second adjudication hearing, held over three weeks later, on 5 November 2020. At the 5 November hearing, Ms. D testified she "didn't take [Respondent-Mother's text message in which she stated she was going to kill Riley] literally." However, the majority notes on multiple instances Ms. D "didn't take literally" Respondent-Mother's text messages. This statement by the majority takes Ms. D's testimony out of context since her response at the hearing only pertained to the text messages in which Respondent-Mother stated she was going to *kill* Riley—not to the text message string in general. Also, the majority's emphasis on Ms. D's testimony in which she testified she did not take Respondent-Mother's text messages "literally," conflicts with the other evidence of record, including Ms. D's earlier testimony. The majority's emphasis on certain evidence, while being dismissive of other evidence, necessarily demonstrates its undertaking of determining witness credibility and the weight to be given to the evidence—a role reserved for the trial judge and not this Court. *See In re Whisnant*, 71 N.C. App. at 441, 322 S.E.2d at 435.

¶ 38        Similarly, the majority appears to hold that the text messages could not be clear and convincing evidence of a substantial risk of harm toward Riley based in part

*CARPENTER, J., concurring in part and concurring in result only in part.*

on Respondent-Mother's own testimony at the adjudication hearing in which she testified she was only "venting" in her "hyperbolic" text messages to Ms. D. This reasoning again involves determining witness credibility and evidence weight, which was solely within the province of the trial court. *See In re Whisnant*, 71 N.C. App. at 441, 322 S.E.2d at 435.

¶ 39    Finally, the majority relies heavily on unpublished opinions of this Court in considering whether the trial court's neglect adjudication was based on sufficient findings of fact or sufficient evidence. As this Court has previously noted, "a parent's conduct in a neglect determination must be viewed on a case-by-case basis considering the totality of the evidence." *In re L.T.R.*, 181 N.C. App. 376, 384, 639 S.E.2d 122, 128 (2007). In the instant case, the evidence included, *inter alia*, testimony by Respondent-Mother in which she describes calling 911 "to make sure that there would be another adult [at her home]," testimony by witnesses including Ms. D, and multiple text messages sent by Respondent-Mother to Ms. D in which Respondent-Mother threatened to harm Riley. Accordingly, I would hold there was sufficient evidence in the record for the trial court to make a finding Respondent-Mother posed a "substantial risk of [physical] impairment" to Riley "as a consequence of [her] failure to provide proper care . . . ." *See In re Safriet*, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901–02 (1993). Since the trial court failed to make such a finding, I would conclude the trial court's findings were insufficient under N.C. Gen. Stat. § 7B-

*CARPENTER, J., concurring in part and concurring in result only in part.*

101(15) (2019) to support a conclusion of law that Riley was a neglected juvenile. Therefore, I agree with the majority's decision to reverse the trial court's adjudication of neglect and remand to the trial court to make additional findings of fact regarding "the existence or nonexistence of any of the conditions alleged in [DSS's] petition." *See In re V.B.*, 239 N.C. App. 340, 344, 768 S.E.2d 867, 869–70 (2015); *In re H.J.A.*, 223 N.C. App. 413, 419, 735 S.E.2d 359, 363 (2012) (stating our Court "must reverse the trial court's order" where there is sufficient evidence in the record to support a finding, yet the trial court failed to make such a finding).

For the reasons stated above, I fully concur with the majority opinion on the issue of the dependency adjudication. I disagree with the majority's reasoning with respect to the issue of the neglect adjudication, and therefore, I respectfully concur in result only with the majority's opinion on this issue.